IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| DAN CARMAN, et al., | ) | |
| | ) | Case No. 5:22-cv-149-KKC |
| Plaintiffs, | ) | |
| | ) | Judge Karen K. Caldwell |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES
OF AMERICA'S MOTION TO DISMISS AMENDED COMPLAINT**

Date:   December 12, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Kyle L. Bishop*
KYLE L. BISHOP
RYAN O. MCMONAGLE
MOIRA E. GOODWIN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-616-1878 (KLB)
202-514-6866 (fax)
Kyle.L.Bishop@usdoj.gov

# TABLE OF CONTENTS

I.    Preliminary statement. ................................................................................................. 3

II.   Statement of facts........................................................................................................ 4

III.  Standard of review. ..................................................................................................... 6

IV.   Argument. .................................................................................................................... 7

   A.   The Court lacks jurisdiction over the plaintiffs' speculative claims and should decline to issue an advisory opinion................................................................................................ 7

     1.   No plaintiff can establish standing to challenge a law that has yet to take effect and may never be enforced against them................................................................................... 8

       i.    Dan Carman lacks standing. ........................................................................... 10

       ii.   Coin Center lacks standing. ............................................................................ 15

       iii.  Raymond Walsh lacks standing. ..................................................................... 17

       iv.   Quiet Industries lacks standing. ...................................................................... 18

     2.   The plaintiffs' challenges are not ripe because none of the plaintiffs' claims are fit for pre-enforcement judicial decision.......................................................................................... 19

   B.   Even if the Court had jurisdiction, it should still dismiss because the plaintiffs failed to state a claim for which relief can be granted. .......................................................................... 21

     1.   The plaintiffs' Fourth Amendment claim fails because there is no search under section 6050I that implicates the Fourth Amendment's protections, and the plaintiffs cannot show that there is "no set of circumstances" under which section 6050I would be constitutional.22

       i.    Recipients of more than $10,000 of cash or digital assets in the course of their trade or business do not have a reasonable expectation of privacy with respect to their personal information connecting them to those transactions. .......................................................... 23

       ii.   The plaintiffs' allegations show that there are numerous circumstances in which section 6050I does not violate the Fourth Amendment, which precludes their facial challenge. ................................................................................................................... 29

     2.   The plaintiffs' First Amendment freedom of association claim cannot succeed because amended section 6050I withstands exacting scrutiny.......................................................... 32

     3.   The plaintiffs' Fifth Amendment argument that the statute is void as vague fails because the statute puts ordinary people on notice as to what conduct is prohibited by law. 35

     4.   The authority to enact section 6050I falls within Congress's enumerated powers because tax information reporting requirements are necessary and proper to Congress's exercise of its taxing and commerce powers. ................................................................... 37

     5.   The statute does not implicate the Fifth Amendment's protection against compelled self-incrimination................................................................................................................ 40

V.    Conclusion. ................................................................................................................ 40

One of the government's best defenses against tax evasion is collecting information about taxpayers when they send or receive money. Studies show that taxpayers consistently report income more accurately when that income is "subject to third-party reporting or withholding." See Morse, Karlinsky & Bankman, Cash Business and Tax Evasion, 20 Stan. L. & Pol'y Rev. 37, 39 (2009). In light of this, Congress requires taxpayers to report certain information to the IRS. And for more than three decades, Congress has required taxpayers engaged in a trade or business to report the receipt of cash (and cash equivalents) to the IRS. See 26 U.S.C. § 6050I (hereinafter "§ 6050I"). These requirements have survived numerous constitutional challenges by taxpayers unhappy to learn that the IRS is aware of income they receive from sources that would otherwise be difficult to trace. See, e.g., United States v. Goldberger & Dubin, P.C., 935 F.2d 501, 503 (2d Cir. 1991).

In the last decade, the use of cryptocurrency has rapidly expanded. Like cash, cryptocurrency allows taxpayers to exchange value in ways that might otherwise escape reporting to the IRS. So unsurprisingly, Congress amended § 6050I to require taxpayers in a trade or business to report receipt of digital asset(s) (i.e., cryptocurrency) of $10,000 or more to the IRS in the same way they report cash transactions. That provision goes into effect January 1, 2024. See § 6050I(d).[1]

Before the statute goes into effect, the plaintiffs seek an order barring the IRS from enforcing this congressionally enacted extension of § 6050I's reporting requirement. The plaintiffs' arguments primarily boil down to the suggestion that cryptocurrency is so unique that

---

[1] Section 6050I(d) incorporates the definition of digital asset used in section 6045(g)(3)(D): "Except as otherwise provided by the Secretary, the term 'digital asset' means any digital representation of value which is recorded on a cryptographically secured distributed ledger or any similar technology as specified by the Secretary."

Congress cannot require its users to report large business transactions to the IRS, in spite of decades of jurisprudence permitting the IRS to receive such information about cash transactions.

This suit should be dismissed. To start, the plaintiffs sued prematurely. None of them has standing to proceed because, in every instance, they either cannot establish an injury-in-fact or show that any purported injury is caused by the reporting requirement. And even if the plaintiffs could cure these jurisdictional deficiencies, the doctrine of ripeness precludes review at this time. Courts should only engage in pre-enforcement review when the issues are fit for decision.

Even if the Court could reach the merits, it should still dismiss the plaintiffs' constitutional counts. Their Fourth Amendment argument cannot survive because there is no search under § 6050I that implicates the Fourth Amendment's protections. Additionally, the plaintiffs cannot prevail in their facial challenge to the amended statute because they cannot show that there is "no set of circumstances" under which § 6050I would be constitutional.

Their First Amendment argument also cannot prevail. The plaintiffs allege that § 6050I is not narrowly tailored because the reporting regime is universal. (Compl. ¶ 236).[2] This is simply wrong. The reporting requirement only applies to large (*i.e.*, over $10,000) transactions that occur in the course of the recipient's trade or business. 26 U.S.C. § 6050I(a)(2). These two conditions substantially limit the circumstances where the requirement will apply, and this narrow tailoring satisfies the requirements of the First Amendment.

The plaintiffs' remaining three arguments fare no better. A facial challenge claiming a statute is so vague it violates the Fifth Amendment can only succeed if there are no instances where the statute is constitutional, and the plaintiffs' complaint includes examples where § 6050I clearly applies. (See, e.g., compl. ¶ 136 (Carman plans to receive in excess of $10,000 in digital assets

_____

[2] All references to "Compl." are to the Amended Complaint. (Dkt. 27).

while operating his business)). The application is clear and, therefore, it is not vague. The statute falls within Congress's enumerated powers because it is convenient, useful, or conducive to the beneficial exercise of the taxing power, just as it has been for the four decades the statute has applied to cash. And the plaintiffs admit their final argument—that the statute violates the Fifth Amendment's protections against self-incrimination—is foreclosed by precedent.

In short, the plaintiffs ask this Court to view cryptocurrency as *sui generis*. But taxpayers exchanging value is not new. And neither is the requirement that, in certain circumstances, those taxpayers must report that exchange to the IRS. The Court should dismiss.

## I.     Preliminary statement.

While the federal system of taxation rests largely on taxpayers reporting information correctly to the government, "it would be naïve to ignore the reality that some persons attempt to outwit the system." United States v. Bisceglia, 420 U.S. 141, 145 (1975). Acknowledging this reality, Congress has imposed information-reporting requirements on taxpayers since 1938. Pub. L. No. 75-554, 52 Stat. 447, § 147(a) (1938) ("All persons, in whatever capacity" that make "payment to another person [of] $1,000 or more" shall "make returns in regard" to those payments as required by regulations issued by the Secretary of the Treasury). That legislation required payors to furnish the name and address of the recipient of the funds. Id. § 147(c). Nothing in the statute modified its requirements based on the method of payment. Id.

Almost five decades later, Congress enacted § 6050I. At the time, that provision required taxpayers that received over $10,000 in cash in a trade or business to disclose that transaction to the IRS. Pub. L. No. 98-369, 98 Stat. 685-56, § 146 (1984). A few years later, Congress expanded the reach of the provision to also require disclosure of the receipt of "any monetary instrument," such as cashier's checks, bank drafts, traveler's checks, or money orders, when the face value of

the instrument was not more than $10,000 (monetary instruments over $10,000 are reported under other provisions by banks). Pub. L. No. 101-508, 104 Stat. 1388, § 11318 (1990).

Three decades later, Congress again expanded the definition of cash in § 6050I to also require disclosure when a person operating a trade or business receives over $10,000 in digital assets. Pub. L. 117-58, 135 Stat. 1341, § 80603 (2021). Digital assets include "any digital representation of value which is recorded on a cryptographically secured distributed ledger or any similar technology as specified by the Secretary [of the Treasury]." Id. (amending § 6045(g)(3)(D) and making provision effective for returns due after Dec. 31, 2023). Because digital assets did not exist when Congress made its 1990 amendments, § 6050I did not describe whether it applied to transactions involving digital assets. See Staff of J. Comm. on Taxation, 117th Cong., Technical Explanation of Section 80603 4 (Comm. Print 2021). The effective date of the amendment is January 1, 2024. Pub. L. 117-58, 135 Stat. 1341, § 80603 (2021).

## II.   Statement of facts.

There are four plaintiffs in this suit. The first, Dan Carman, is an individual businessman and attorney. (Compl. ¶ 134). He currently receives over $10,000 in cryptocurrency from small businesses in exchange for providing services as a Bitcoin consultant and intends to continue doing so. (Id. ¶ 136). Carman also expects to receive over $10,000 from mining cryptocurrency, although he does not allege that he currently earns that amount. (Id. ¶ 137). Carman also "intends" to use cryptocurrency to make purchases in excess of $10,000 (including purchasing goods for his mining business), though he does not allege he currently does so. (Id. ¶ 138). Aside from these activities, Carman also "intends" to donate cryptocurrency to unnamed "advocacy and religious organizations." (Id. ¶ 139). But, again, he does not allege that he currently does so using cryptocurrency. (Id.). Carman alleges he will be required to reveal his participation in business

transactions involving cryptocurrency that exceed $10,000. (Id. ¶ 140). He speculates § 6050I will "make businesses more reluctant to use Bitcoin," which will harm him financially. (Id. ¶ 142). He also theorizes that the government might use public information revealed on the blockchain to learn about his cryptocurrency transactions. (Id. ¶¶ 143–44, 146). Based on his distrust of digital storage by others, he posits that he will be less likely to use cryptocurrency if § 6050I goes into effect. (Id. ¶ 146). Finally, he complains of various compliance costs associated with the reporting of § 6050I transactions. (Id. ¶ 145).

Coin Center is a Washington D.C.-based corporation that advocates for the expanded use of cryptocurrency. (Id. ¶ 148). It funds these operations through the sale of sponsorships and the receipt of contributions, and sometimes receives these amounts in cryptocurrency transactions that exceed $10,000. (Id. ¶ 149–50). Coin Center plans to continue operating this way and does not "wish to" disclose these transactions. (Id. ¶ 149). It hypothesizes that "some of its donors would be less likely to donate" if § 6050I went into effect. (Id. ¶ 153). And it too alleges it will incur compliance costs. (Id. ¶¶ 154–55).

Raymond Walsh is a software engineer, small businessman, and Bitcoin miner. (Id. ¶ 157). He owns Quiet Industries. (Id. ¶ 159). As its owner and operator, Walsh receives Bitcoin payments exceeding $10,000 in single or related business transactions. (Id. ¶ 160). He also regularly remits over $10,000 in single or related cryptocurrency transactions. (Id. ¶ 161). He expects to continue these activities in the future and speculates he will struggle to comply with § 6050I. (Id. ¶¶ 162–63). He suggests he will incur compliance costs. (Id. ¶ 165). He also states he

does not want to comply with § 6050I due to speculative concerns that the government will become aware of all transactions of his listed on the public ledger.[3] (Id. ¶¶ 167–69).

His company, Quiet Industries, is a Bitcoin mining corporation. (Id. ¶ 171). It also regularly receives over $10,000 of cryptocurrency in single or related transactions and intends to continue these activities. (Id.). Quiet Industries alleges it will be subject to § 6050I, that it would struggle to comply with its requirements, and thus "will face an uncertain and compromised business environment and will likely lose business." (Id. ¶ 175). It further alleges that it will incur the same compliance costs as Mr. Walsh. (Id. ¶ 174).

## III.   Standard of review.

The plaintiffs bear the burden of establishing subject-matter jurisdiction, including standing. Wayside Church v. Van Buren Cty., 874 F.3d 812, 816 (6th Cir. 2017), abrogated on other grounds by Knick v. Twp. of Scott, 139 S. Ct. 2162, 2167 (2019). "Challenges to subject-matter jurisdiction under Rule 12(b)(1) come in two varieties: a facial attack or a factual attack." Id. at 816. A facial attack on subject-matter jurisdiction—such as this one—challenges the sufficiency of the complaint and assumes the truth of all factual allegations in the complaint. Id.; Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 440 (6th Cir. 2012).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Courser v. Allard, 969 F.3d 604, 615 (6th Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

---

[3] The public ledger is sometimes called a blockchain. It is a "cryptographically secured public ledger, shared among a distributed network of validating computers, each running common software that guides them to a consensus on the legitimacy of new entries and prevents anyone from unilaterally rewriting that agreed record." Andrew Haynes & Peter Yeoh, Cryptocurrencies and Cryptoassets: Regulatory and Legal Issues 8 (2020) (internal citation omitted).

The court must "take factual allegations as true, but need not accept legal conclusions couched as factual allegations." Id.

## IV.    Argument.

The plaintiffs' amended complaint fails both to establish this Court's subject matter jurisdiction and to state a claim for relief. None of the plaintiffs have established their standing, or presented a ripe claim. And each of the purported constitutional challenges to § 6050I are implausible, foreclosed by law, or both. The Court should dismiss this action.

### A.    The Court lacks jurisdiction over the plaintiffs' speculative claims and should decline to issue an advisory opinion.

The jurisdiction of the federal courts extends only to "Cases" and "Controversies." U.S. Const. art. iii, § 2; see also Spokeo, Inc. v. Robins, 578 U.S. 330, 337 (2016). Over time, the Supreme Court has crafted several justiciability doctrines to "ensure that federal courts do not exceed their authority as it has been traditionally understood" and to prevent "the power of the Federal Judiciary" from "intrud[ing] upon the powers given to the other branches." Spokeo, Inc., 578 U.S. at 337–38. Two of those doctrines bar the case here.

First, a plaintiff must have standing to press a claim. The authority of the federal courts "begins and ends with the need to adjudge the rights of an injured party . . . seeking redress." United States v. Windsor, 570 U.S. 744, 781 (2013) (Scalia, J., dissenting). This Court lacks jurisdiction over this case unless one plaintiff can meet the "irreducible constitutional minimum of standing." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). Second, a claim must be ripe before it can be heard as a 'Case' or 'Controversy.' The Supreme Court has long established that Article III creates an absolute bar on advisory opinions. See Windsor, 570 U.S. at 781 (citing 3 Correspondence And Public Papers of John Jay 486–89 (H. Johnston ed. 1893)). The plaintiffs

lack standing because they have not pled an actual or imminent injury. And their challenge is not ripe because it is not fit for judicial review. Both deficiencies deprives this court of jurisdiction.

### 1. No plaintiff can establish standing to challenge a law that has yet to take effect and may never be enforced against them.

To establish Article III standing, a plaintiff must plead (and ultimately prove) an "injury in fact" that is "fairly traceable to the challenged action of the defendant" which is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 560 (cleaned up). An injury must be "concrete and particularized, and actual or imminent, not conjectural or hypothetical." Id. (cleaned up).

The plaintiffs bear the burden to establish standing for each of their claims. Clapper v. Amnesty Intern. USA, 568 U.S. 398, 411–12 (2013). A plaintiff's standing "cannot be inferred argumentatively from averments in the pleadings, or even from the government's concession," but must instead "affirmatively appear in the record." Crawford v. U.S. Dep't of Treasury, 868 F.3d 438, 457 (6th Cir. 2017). And while only one plaintiff need establish standing for a case to move forward, any plaintiff that the Court determines lacks Article III standing must be dismissed. See Kentucky v. Yellen, 2022 WL 17076099, at *12 n.12 (6th Cir. Nov. 18, 2022).

The Supreme Court cautions that a court's standing inquiry should be "especially rigorous" when a claim challenges the constitutionality of an action taken by one of the other branches of government. Clapper, 568 U.S. at 408. Strict standing requirements are vital to limit the judiciary to those disputes traditionally within its authority and "prevent the judicial process from being used to usurp the powers of the political branches." Spokeo, Inc., 578 U.S. at 338.

To satisfy the injury requirement, a plaintiff must allege a harm that is either actual or imminent. Parsons v. U.S. Dep't of Justice, 801 F.3d 701, 710 (6th Cir. 2015). The Sixth Circuit has defined 'imminent' to mean "certainly impending, in contradistinction to allegations of

possible future injury." Id. While a risk of future harm can satisfy the concrete-harm requirement in a suit for injunctive relief, the risk of harm must be "sufficiently imminent and substantial." TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2210 (2021); Crawford, 868 F.3d at 454 (threatened injury must be "real, immediate, and direct"). In other words, the harm needs to be "*certainly* impending." Clapper, 568 U.S. at 409 (emphasis in original). "A highly attenuated chain of possibilities" does not suffice. Kanuszewski v. Mich. Dep't of Health & Human Servs., 927 F.3d 396, 405–06 (6th Cir. 2019) (quoting Clapper, 568 U.S. at 410).

A threatened injury must also be concrete. A speculative injury cannot be the basis for Article III standing. E.g., Vonderhaar v. Village of Evandale, Ohio, 906 F.3d 397, 401 (6th Cir. 2018) (quoting Clapper, 568 U.S. at 410). Importantly, "mere speculation and assumptions about how the government will operate one of its programs is not a sufficiently particularized harm to meet the injury-in-fact requirement . . . [E]ven where the government has the power to do what a plaintiff fears it might." Kanuszewski, 927 F.3d at 410; accord Clapper, 568 U.S. at 420 ("[R]espondents in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions.").

And, as stated above, a concrete, imminent threat of injury must be "fairly traceable" to the challenged action. See Crawford, 868 F.3d at 459. A harm a plaintiff inflicts on itself in anticipation of a "hypothetical future harm that is not certainly impending" cannot establish standing. Clapper, 568 U.S. at 416 (holding plaintiffs lacked standing where harm articulated as costs and burdens plaintiffs incurred based on a fear of surveillance that was not certainly impending). The required chain of causation can also be broken by a third-party's voluntary choice, even if that choice results from the challenged action. Crawford, 868 F.3d at 459 (a third-party

bank's decision to stop doing business with a plaintiff because of the challenged reporting requirement was not fairly traceable to that reporting requirement).

These plaintiffs have failed to establish standing to bring a pre-enforcement, facial challenge to § 6050I. Here, the plaintiffs do not (and cannot) allege an actual injury from an amendment that has not yet gone into effect. § 6050I; cf. Crawford, 868 F.3d at 458. Instead, they laid out speculative harms they fear they might suffer. Nor can the plaintiffs show that those speculative, second-order harms can be fairly traced to the extension of § 6050I to digital assets.

### i.      Dan Carman lacks standing.

Carman presents facts which appear to create three theories of standing, none of which rest on an injury that can be fairly traced to § 6050I. First, Carman suggests that he intends to engage in future transactions which may trigger the statute's reporting requirements, and that he will incur compliance costs due to the reporting mandate. (Compl. ¶¶ 135–38). To be clear, the mere existence of a reporting requirement does not constitute an injury because "there is no legally protected interest in maintaining the privacy of one's bank records from government access." Crawford, 868 F.3d at 453. Nor is there a legally protected interest in keeping financial transactions from the government, even outside the banking context. See United States v. Ritchie, 15 F.3d 592, 601 (6th Cir. 1994) ("[W]e have searched in vain to find support for the proposition that there is a constitutionally protected liberty interest in spending large amounts of cash without having to account for it.").

Instead, Carman suggests that he suffers a direct harm from the speculative compliance costs he alleges he will incur. (Compl. ¶ 145). Importantly, Carman does not allege that he will incur new compliance costs in *obtaining* the taxpayer information of those with whom he is transacting. (Cf. id.). Instead, he complains only of the costs associated with *reporting* that

information to the IRS. (Id.). This is hardly an oversight; it is implausible that Carman does not already keep business records containing the information required to be reported under § 6050I. The only new compliance cost created by the statute's amendment is thus the cost associated with filing the appropriate form with the Service. But that cost is not certainly impending; no form need be filed until the amendment takes effect in 2024. And even if that were not the case, while it is true that compliance costs can constitute an injury in fact for purposes of Article III, Kentucky v. Yellen, 2022 WL 17076099, at *13 (6th Cir. Nov. 18, 2022), the de minimis cost associated with filing an additional form containing information already in his possession is not sufficient to allow this pre-enforcement review.

Carman does not and cannot credibly allege that he lacks the reportable information of his clients. As the government explained in its initial motion to dismiss and the plaintiffs tellingly failed to address in their amended complaint, (dkt. 26-1 at 22–23), to the extent Carman's clients are paying him as a 'business consultant,' those funds (and the parties to the transaction) *already* must be reported to the IRS. See 26 U.S.C. § 6041(a); 26 C.F.R. § 1.6041-6(a). Carman must track this information under statutes and regulations that predate any amendment to § 6050I. Id. His clients must furnish Carman a copy of the Form 1099 (containing their reportable information) that they filed with the IRS. Id. And in order for Carman's clients to accurately report such payments to the IRS, Carman must provide those clients with his taxpayer information, such as through a Form W-9. Because these (and other) recordkeeping and reporting requirements are independent of § 6050I, any compliance costs associated with obtaining and organizing that information cannot be 'fairly traced' to § 6050I.

There are, therefore, no *new* compliance costs associated with the retrieval and maintenance of the information required to be reported by § 6050I. Seemingly recognizing this

problem, Carman frames his compliance costs in narrow terms, claiming only that costs will be incurred from the § 6050I *reports* he alleges he may have to file with the IRS and furnish to payors. (Compl. ¶ 145). These costs are impermissibly speculative. The law could change before any reports are due; the IRS could issue regulations that interpret the statutory reporting requirements more narrowly than Carman anticipates. That there is a non-zero chance Carman may never incur this cost is sufficient to defeat his standing.

And even if Carman had an obligation to submit a § 6050I form tomorrow, the de minimis costs associated with that action should not be enough to allow for the sort of pre-enforcement judicial intervention these plaintiffs seek. The IRS currently estimates that Form 8300 will take taxpayers, on average, 21 minutes to complete. See Exhibit 1. It defies reason to think that Carman—in full possession of the information required to be reported—will incur any meaningful compliance costs as a result of the additional form. And while the Sixth Circuit has indicated that compliance costs *can* create a sufficient injury to establish Article III standing, it has not squarely held that this sort of de minimis burden is categorically sufficient to justify federal court intervention. Cf. Kentucky v. Yellen, 2022 WL 17076099, at *13 (6th Cir. Nov. 18, 2022); Caldwell v. Caldwell, 545 F.3d 1126, 1134 (9th Cir. 2008) (Fletcher, J., concurring). But see Halbig v. Burwell, 758 F.3d 390, 396–97 (D.C. Cir. 2014) (accepting a cost of $21 as an injury in fact). Carman also implies that he faces "potential penalties," seemingly as a result of future noncompliance. (Compl. ¶¶ 147); Crawford, 868 F.3d at 446. But Carman has not alleged an intent to violate the statute's reporting requirement. Crawford, 868 F.3d at 460. Nor has he established a credible threat of the imposition of a failure-to-file penalty if, at some point in the future, he decides to violate the reporting requirement. Id. Similarly, "[t]he mere *possibility* of prosecution"—should

Carman decide in the future to violate § 6050I rather than comply—cannot establish a credible threat of future harm. Id. at 454 (emphasis in original).

Carman's second theory seems to rest on future harm to his business revenues, because a reporting requirement could cause potential cryptocurrency users to be "more reluctant to use Bitcoin," and thus less likely to hire Carman as a "Bitcoin consultant." (Compl. ¶ 142). Any potential harm to Carman's business revenues is just as speculative and no more imminent than the potential costs of compliance. But even if Carman could show that a direct harm to his bottom line was certainly impending, it would not be fairly traceable to § 6050I. A third party's choice to decline to do business with Carman would be a choice voluntarily made by that third party and would not be fairly traceable to the statute. See Crawford, 868 F.3d at 459.

Finally, Carman suggests that § 6050I would make him less likely to engage in expressive activities, giving him standing to bring a First Amendment challenge. (Compl. ¶¶ 139, 143, 146). But he has failed to allege facts to support a concrete injury in fact to his right of association. The First Amendment protects two types of associations: "choice[s] to enter into and maintain certain intimate or private relationships" and associations "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548 (1987). Importantly, commercial relationships are not similarly protected associations. United States v. Bell, 414 F.3d 474, 485 (3d Cir. 2005) ("Producing a customer list does not offend the First Amendment because commercial transactions do not entail the same rights of association as political meetings."); In re Grand Jury Subpoena Served Upon PHE, Inc., 790 F. Supp. 1310, 1317 (W.D. Ky. 1992) ("[T]he commercial relationship arising from the transactions between PHE and its customers 'is not protected as an associational right arising under the first amendment.'").

13

The statute only requires disclosure of certain transactions done in the course of the payment recipient's trade or business. Carman does not explain how donations would qualify as a transfer subject to § 6050I. Indeed, the donative intent when someone sends digital assets to advocacy and religious organizations may take the transfer out of the statute. He thus cannot allege that § 6050I directly infringes on his expressive activities. Instead, Carman's argument appears to be that if the government received information from a third party of his digital asset business transaction, the government could then learn Carman's cryptocurrency address and identify *other* transactions entered by or through that address, and those *other* transactions *could* include First-Amendment-protected activities. This multi-step, compound hypothetical is precisely the sort of theory that "relies on a highly attenuated chain of possibilities," and that therefore "does not satisfy the requirement that threatened injury must be certainly impending." Clapper, 568 U.S. at 410.

Further, where the complained-of injury is chilled speech, the Sixth Circuit requires that "the repercussions responsible for the chilling effect must be imminent," and has emphasized that "allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." Parsons, 801 F.3d at 711. Carman identifies no specific future harm that would justify his independent decision to refrain from using cryptocurrency to engage in expressive activities. There is no allegation that § 6050I prohibits First Amendment activities. Cf. id. Nor are there allegations of reputational injury or stigmatization. See id. at 711–12. An alleged chilling effect, without more, does not constitute an injury in fact. Id. at 711. Carman thus lacks standing to press a First Amendment—or any other—challenge to § 6050I.

Finally, the plaintiffs' blockchain records are public. When someone chooses to engage in transactions in a public space they should not be heard to complain that the information can be

viewed by others, including the government. Carman made no allegation that he could not donate to advocacy or religious organizations with another means that would not require the organization to make a report, such as a check or credit card payment. See Goldberger & Dubin, P.C., 935 F.2d at 504 ("To avoid disclosure under [§ 6050I], they need only pay counsel in some other manner than with cash. The choice is theirs. None of the appellants has advanced a legitimate reason why payment other than in cash cannot be made.").

### ii.      Coin Center lacks standing.

Coin Center also appears to rest its injury on three standing theories, which fare no better than Carman's. First, its alleged costs of compliance or penalties for noncompliance are similarly not certainly impending. (Compl. ¶¶ 154–55). Most importantly, it is far from clear that Coin Center, as a § 501(c)(4) organization, would even be subject to the reporting requirement, making any harm incurably speculative.[4] Cf. Crawford, 868 F.3d at 458 (noting that a plaintiff cannot challenge a reporting requirement "without showing that [the plaintiff] *himself* is subject to those provisions" (emphasis in original)). Coin Center does not allege that it receives digital assets in excess of $10,000 *in the course of a trade or business*. Absent a reasonable likelihood that Coin Center will be subject to the reporting requirement, it cannot have standing to challenge it. Cf. City of Los Angeles v. Lyons, 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions."); Yellen, 2022 WL 17076099 at *12 n.12 (noting that a plaintiff that clearly lacks standing should be dismissed from an action, even if other plaintiffs would have standing to press the claim). As

---

[4] Coin Center states that it will "arguably" be subject to § 6050I, (compl. ¶ 149), and, after stating only that it receives donations (*not* business income), avers that such transactions "will necessitate that other parties or it report the transactions to the government," (id. ¶ 151) and claims that its "status as a non-profit does not exempt it" from the statute (id. ¶ 152). The Court need not accept these legal conclusions as true. See Iqbal, 556 U.S. at 678.

to the decreased revenue theory, just as Carman cannot claim an injury if potential clients elect not to patronize his Bitcoin consulting business, if Coin Center's potential donors fear government oversight and decline to donate to or sponsor Coin Center's advocacy, Sixth Circuit precedent makes clear that such a decision is not fairly traceable to § 6050I. See Crawford, 868 F.3d at 459.

Coin Center tries to rest standing for its First Amendment challenge on the potential chilling effect the reporting requirement could have on its potential donors. (Compl. ¶ 153). Like Carman, the attenuated theory appears to be that Coin Center's donors may use their cryptocurrency addresses to engage in covered business transactions, reportable to the government. The government, in theory, could then track that address and learn of the donors' non-business transactions, including donations to Coin Center. Those donors might then decline to donate to Coin Center using cryptocurrency because the government could learn of it. As explained above, a theory that "relies on a highly attenuated chain of possibilities" cannot support standing. See Clapper, 568 U.S. at 410; accord id. at 420 (holding that a plaintiff cannot "rest on mere conjecture about possible governmental actions" and must instead present "concrete evidence to substantiate their fears"). Also as explained above, Coin Center's donors have available other means of making donations to Coin Center or conducting their other business. No one must put all their transactions on a public ledger. And no one has a constitutional right to hide their identity when engaging in financial transactions. Ritchie, 15 F.3d at 601.

Coin Center's theory also fails for the further, independent reason that Coin Center cannot assert standing to vindicate the First Amendment rights of its potential donors. See Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Coin Center has not alleged that it has a close relationship with its donors such that it is well positioned to assert their interests. See id. Nor has it alleged that those donors are somehow hindered from bringing a challenge themselves. Id.

16

### iii.        Raymond Walsh lacks standing.

Walsh alleges facts that seem to indicate two standing theories. Walsh appears to recycle the compliance costs injury, with the added wrinkle that, as a "miner," reporting would be particularly challenging, resulting in, seemingly, higher compliance costs or increased likelihood of penalties for mistakes. (Compl. ¶ 165). Alternatively, Walsh appears to allege an intangible, psychic harm in being forced to share reports of his business activities with the federal government. (Id. ¶ 168). Neither theory provides Walsh with an Article III Case or Controversy.

As with Carman and Coin Center, Walsh's compliance cost theory does not establish standing. To the extent Walsh is receiving cryptocurrency in the course of a trade or business, (e.g., compl. ¶¶ 161–62), he is no different than Carman and other income reporting requirements likely require him to obtain and maintain identifying information from those with whom he is transacting. He does not allege that he does not currently keep such records. See 26 U.S.C. § 6001; 26 C.F.R. § 1.6001-1(a). He does not allege that he cannot determine the value of the digital asset on receipt (indeed, he is required to determine and report it on his income tax return, per IRS Notice 2014-21). Costs associated with tracking that information thus cannot be traced to the amendment to § 6050I.

And insofar as Walsh is receiving assets "from the Bitcoin software itself" then, by his own admission, there is no other party whose information he *could* obtain and report. (Compl. ¶ 160). By Walsh's own theory there would be no compliance costs. And even accepting Walsh's questionable allegation that it would be "impossible" to obtain information from those for whom he validates transactions, (id.) the prematurity of this suit prevents any attendant injury from being sufficiently impending. Walsh cannot show that his confusion will not be addressed by future IRS guidance, or that his explanation of impossibility would not be accepted by the IRS. That Walsh

cannot predict how the reporting requirement will be executed and enforced simply underlines the inappropriateness of this facial, pre-enforcement challenge.

Walsh's discomfort with sharing his business transactions with the government is not an injury in fact. Walsh has no legally protected interest in maintaining the privacy of his financial transactions from government access. Crawford, 868 F.3d at 453; Ritchie, 15 F.3d at 601. And the Sixth Circuit expressly held that a plaintiff's personal discomfort with a financial reporting requirement does not constitute an injury in fact. Crawford, 868 F.3d at 459.

### iv.     Quiet Industries lacks standing.

Quiet Industries lacks standing for reasons already discussed. It also alleges it receives payments in Bitcoin in the course of its business and intends to continue to do so. (Compl. ¶ 171). It complains that it will incur compliance costs or penalties for noncompliance. (Id. ¶ 174). And it appears to suggest that general uncertainty in the cryptocurrency space somehow created by a transaction-reporting requirement would result in a loss of business. (Id. ¶ 175) As is clear given the analysis above, neither theory gives Quiet Industries standing to challenge § 6050I.

Furthermore, because Quiet Industries conducts a trade or business, it is already required to report cash receipts of $10,000 or more. That was as true before the recent amendment as it is since. All the concerns they have—from compliance costs to supposed "chilling" of their associations—exist already with respect to cash transactions. Because the plaintiffs do not allege a new and *different* concern raised by the extension of § 6050I, they cannot show that their claimed injuries are "fairly traceable" to the amendment. Similarly, as discussed thoroughly above, if Quiet Industries is conducting business, there are plenty of statutes and regulations requiring it to maintain business records, including records of with whom it transacts. E.g., 26 U.S.C. § 6001; 26 C.F.R. § 1.6001-1(a). It does not allege that it lacks the information required to be reported by

§ 6050I. And the de minimis costs associated with submitting an additional form (in the future) should not be sufficient to create a new injury in fact.

> **2.  The plaintiffs' challenges are not ripe because none of the plaintiffs' claims are fit for pre-enforcement judicial decision.**

Even if one of these plaintiffs could establish standing to challenge § 6050I, that challenge would not be ripe. A claim must be ripe before it can be adjudicated in a federal court. This limitation is essential to the separation of powers. By avoiding premature adjudications, the courts can avoid "entangling themselves in abstract disagreements over administrative policies." Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807 (2003). The ripeness requirement also protects the other branches from "judicial interference" until an action has been taken "and its effects felt in a concrete way by the challenging parties." Id. at 807–08.

A pre-enforcement challenge is ripe only when the issues are fit for judicial decision and there is a risk of hardship to the parties in delay. Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105 (1977). And a facial— as opposed to as-applied—challenge to a statute "exacerbates the concerns underlying the ripeness doctrine." Warshak v. United States, 532 F.3d 521, 528–29 (6th Cir. 2008). The plaintiffs' facial challenges fail at step one of Abbott Laboratories and should be dismissed.[5]

A claim is fit for judicial decision when it "presents an issue that is purely legal, and will not be clarified by further factual development." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 167 (2014). The claim must "arise[] in a concrete factual context and concern[] a dispute that is likely to come to pass." Warshak, 532 F.3d at 525. A court should avoid "answering difficult legal

---

[5] Because the plaintiffs' claims cannot satisfy step one of Abbott Laboratories' two-part test, the Court need not consider whether the plaintiffs would suffer sufficient hardship to clear step two.

questions before they arise," particularly in the context of constitutional litigation. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 894 (1990).

None of the plaintiffs' purported claims clear this bar. The Fourth Amendment claim is decidedly unsuited to pre-enforcement decision. Fourth Amendment challenges typically require "case-by-case determinations that turn on the concrete, not the general," and courts are therefore careful to offer "incremental, not sweeping, pronouncements of law." Warshak, 532 F.3d at 528. A fact-intensive Fourth Amendment claim is not fit for pre-enforcement review; it is precisely the sort of claim that "would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

A First Amendment challenge can, under certain circumstances, be fit for pre-enforcement review. Such review is not appropriate here. A pre-enforcement, First Amendment challenge is appropriate where a plaintiff "has sufficiently alleged an intention to refuse to comply with the statute" and a threat of prosecution is "imminent." Norton v. Ashcroft, 298 F.3d 547, 554 (6th Cir. 2002). The plaintiffs have not satisfied either requirement. Instead, the plaintiffs all but admit they intend to comply with § 6050I, and speculate only that the government or hackers might, as a result of their compliance with the reporting requirements, link up a person's commercial transactions with their expressive ones. (Compl. ¶ 230). That, in turn, would somehow lead to a chilling effect. Such "imaginative or speculative" claims are not enough. See Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 285 (6th Cir. 1997).

The plaintiffs' Fifth Amendment "void for vagueness" claim is the most clearly unripe. A vagueness challenge to a statute "not threatening First Amendment interests" cannot be brought before the statute has been applied, unless it is "impermissibly vague in all its applications." Id. at 293. The plaintiffs do not even allege, let alone explain why, § 6050I is vague in every single one

of its applications. But even if they did, Congress delegated rulemaking authority to the IRS in § 6050I, and the Sixth Circuit has cautioned that "a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute." Id.

The plaintiffs' remaining claims—that § 6050I is beyond Congress's enumerated powers, and that it violates the Fifth Amendment privilege against self-incrimination—are borderline frivolous. As discussed *infra*, Congress plainly has authority under its commerce and taxing powers to establish a trade-or-business reporting requirement. Further, the plaintiffs concede that filing an information return does not implicate the constitutional privilege against compelled self-incrimination. See United States v. Sullivan, 274 U.S. 259, 264 (1927) (taxpayer cannot "draw a conjurer's circle around the whole matter by his own declaration that to write any word upon the government blank would bring him into danger of the law").

### B.     Even if the Court had jurisdiction, it should still dismiss because the plaintiffs failed to state a claim for which relief can be granted.

Putting aside the jurisdictional defects, the Court should still dismiss this suit because the plaintiffs' various constitutional challenges to § 6050I do not withstand scrutiny. They claim their publicly posted blockchain transactions are somehow more anonymous than cash, such that a disclosure requirement violates a reasonable expectation of privacy protected by the Fourth Amendment. Alternatively, they argue that the requirement—which applies only to large transactions done in the course of one's trade or business—in some way burdens their First Amendment right to association. On top of that, they allege that a straightforward, typical reporting requirement is impermissibly vague in all of its applications such that it should be facially struck down under the Fifth Amendment's Due Process Clause. And they ask this Court to ignore decades of precedent and hold that a tax information reporting requirement is untethered from Congress's

21

taxing and commerce powers and that such a requirement violates the Fifth Amendment's protection against compelled self-incrimination.

These claims have no plausible merit. Though our system of taxation is based on voluntary compliance, Congress's authority to require disclosure of transactions has been upheld since the modern tax system was established. Digital assets are not special.

> **1.    The plaintiffs' Fourth Amendment claim fails because there is no search under section 6050I that implicates the Fourth Amendment's protections, and the plaintiffs cannot show that there is "no set of circumstances" under which section 6050I would be constitutional.**

The plaintiffs first complain that Congress's extension of existing information reporting requirements to digital assets violates the Fourth Amendment's prohibition on unreasonable searches and seizures. (Compl. ¶¶ 185–212). They fault the amended statute for forcing them to "share their personal identifying information in conjunction with the details of their [transactions]" with the individuals on the other end of the transfer, and ultimately the IRS. (Id. ¶ 190). Further, they claim a constitutionally protected privacy interest that shields them from having to disclose to the government who paid them $10,000 in digital assets in their trades or businesses during the year unless the government obtains a warrant. (Id. ¶ 210–11).

Based on Congress's well-established authority to require information reporting, recipients do not have a reasonable expectation of privacy when they receive $10,000 in the course of their business. Nor can they reasonably expect that, when they transfer $10,000 or more to someone else, the third party will not share that information with the government. And finally, their own allegations fail to establish that there is "no set of circumstances" in which § 6050I does not violate the Fourth Amendment such that facial relief is appropriate.

      i.      **Recipients of more than $10,000 of cash or digital assets in the course of their trade or business do not have a reasonable expectation of privacy with respect to their personal information connecting them to those transactions.**

There are "two requirements for a government intrusion to constitute a Fourth Amendment search: first, a person must exhibit 'an actual (subjective) expectation of privacy' in the place or thing searched; second, the expectation is one 'that society is prepared to recognize as 'reasonable.'" United States v. May-Shaw, 955 F.3d 563, 567 (6th Cir. 2020) (quoting Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). A person has a subjective expectation of privacy in things "he seeks to preserve as private, even in an area accessible to the public" but not in things he "knowingly exposes to the public[.]" Katz, 389 U.S. at 351–52 (1967) (majority opinion). And that expectation must be objectively justifiable. Smith v. Maryland, 442 U.S. 735, 740 (1979) (citing Katz, 389 U.S. at 361 (Harlan, J., concurring)).

To begin, the plaintiffs allege that they "intend to continue to use digital assets in transactions covered and affected by the reporting mandate" and that the parties to "covered transactions do not have reason to share the information in the ordinary course of business." (Compl. ¶¶ 19, 207).[6] And because of that, they do not "wish to share the details of [their] transactions with the government." (Id. ¶ 168). Those allegations fall well short of an actual, subjective expectation of privacy.

Whether the plaintiffs are transferees (who must collect and report the information to the IRS), or transferors (whose information is collected and transmitted by third parties) they cannot reasonably expect to keep private the details of business transactions of $10,000 or more. Congress

---

[6] As discussed in this section, that claim is factually incorrect: as much if not all of this same information is exchanged in the ordinary course of business when the payor is a business required to report payments on a Form 1099. See 26 U.S.C. § 6041.

has long imposed recordkeeping and reporting requirements on taxpayers. For example, Congress requires taxpayers to provide their taxpayer identification number to another person if the person must include the identification number on a return they must file. 26 U.S.C. § 6109(a)(2). Many taxpayers see these requirements in action when they fill out a Form W-4 or W-9, and the business later issues them (and files with the IRS) a Form W-2 (if they are employees) or a Form 1099 (if they are independent contractors) after the close of the tax year, as required by law. 26 U.S.C. §§ 6041(a), 6051(a); 26 C.F.R. §§ 1.6041-6(a), 301.6051-1(a). These forms provide both the payor and payee's name, address, and taxpayer identification numbers—*i.e.*, the same information the plaintiffs now ask this Court to regard as private.

Just as Congress requires business payors to file Form 1099s at the end of the year, it also has long required business payees receiving $10,000 or more of cash in the course of a trade or business to report those transactions to the IRS throughout the year. Section 6050I(a)[7] has been in effect for more than thirty years. Its purpose is both obvious and uncontroversial: to "unearth the 'underground economy'" of cash-only transactions.[8] Goldberger & Dubin, P.C., 935 F.2d at 503. "[R]eporting on the spending of large amounts of cash would enable the Internal Revenue Service to identify taxpayers with large cash incomes." Staff of J. Comm. on Taxation, 98th Cong., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 491 (Comm. Print 1984). Information reporting, such as the Form 1099, is used to report many types of transactions

---

[7] For purposes of § 6050I, "cash" includes cash, foreign currency, any monetary instrument with a face amount of not more than $10,000 (other than a check drawn on the account of the writer at a financial institution), and, with the most recent amendment, digital assets.

[8] The plaintiffs' assertion that the reporting requirement sweeps up transactions which are "perfectly legal" is a red herring. (Compl. ¶ 191). The purpose of § 6050I is not just to catch "illegal" transactions, but also legal transactions that the recipient might otherwise not report to the IRS as income, and to identify large cash expenditures by persons who do not report similarly large amounts of income on their own tax returns.

from real estate sales, gambling winnings, miscellaneous income, certain government payments, life insurance sales, and nonemployee compensation to name a few. Similarly, Form 8300 is used to report transactions covered by § 6050I. And U.S. citizens must report information on an interest in a foreign bank account. Crawford, 868 F.3d at 451 (identifying various reporting requirements with respect to foreign accounts).

The Second Circuit summarily rejected a Fourth Amendment challenge to § 6050I brought by attorneys. Goldberger & Dubin, P.C., 935 F.2d at 503. In Goldberger, the Second Circuit noted that a Fourth Amendment challenge to § 6050I "merits only brief discussion," because those plaintiffs' "contentions relative to the Fourth and Fifth Amendments have been rejected consistently in cases under the Bank Secrecy Act by both the Supreme Court and this Court." Id. (citing United States v. Miller, 425 U.S. 435, 444 (1976); Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 59–60 (1974)) (further citations omitted).[9]

When an individual gives information to a third party, and the government obtains that information from the third party, that is typically not a Fourth Amendment search. Miller, 425 U.S. at 443 ("[T]he Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government"). That is so, "even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." Id. For example, banks (like recipients of cash under § 6050I) are required to keep records of any deposit, withdrawal, exchange of currency, or other payment or transfer involving a transaction of more than $10,000. The Supreme Court has made clear that bank customers do not have a reasonable expectation of privacy in their transaction

---

[9] The plaintiffs allege that digital asset users "have developed and adopted a technology designed to preserve personal agency and protect enhanced privacy in transactions." (Compl. ¶ 193). But the same can be true for business transactions in cash.

information with the bank. Id. at 442–43. Like the bank records in Miller, the records of transactions on the blockchain subject to § 6050I reveal commercial transactions.

Unlike cash transactions, transactions involving digital assets are memorialized for all time on a public blockchain ledger. In that way, exchanges of digital assets *are less* private than cash transactions. In United States v. Gratkowski, the Fifth Circuit explained that information on Bitcoin's blockchain is analogous to the bank information at issue in Miller. 964 F.3d 307, 311 (5th Cir. 2020). The court reasoned that "[t]he nature of the information on the Bitcoin blockchain and the voluntariness of the exposure weigh heavily against finding a privacy interest in an individual's information on the Bitcoin blockchain. The Bitcoin blockchain records (1) the amount of Bitcoin transferred, (2) the Bitcoin address of the sending party, and (3) the Bitcoin address of the receiving party." Id. at 311–12. Further, the court observed that users of the blockchain might "enjoy a greater degree of privacy than those who use other money-transfer means, but it is well known that each Bitcoin transaction is recorded in a publicly available blockchain." Id. at 312.

The plaintiffs assert a laundry list of reasons that the third-party doctrine does not apply here, none of which have merit. First, they assert that the third-party doctrine applies only to "conventional . . .intermediar[ies]" like banks and telephone companies. (Compl. ¶ 204). Not so. At times, the third-party doctrine is applied to "conventional intermediaries," but other times it is not. For example, in Miller, the Supreme Court held that banks are not "neutrals" but "parties" to a transaction and applied the third-party doctrine. Miller, 425 U.S. at 440–41. And in Warshak, the Sixth Circuit held that an internet service provider's role as an intermediary weighed against the applicability of the doctrine. Warshak, 631 F.3d at 288.

The plaintiffs next assert that parties to digital transactions do not ordinarily share their names and TINs, would only do so unwillingly, and have no reason other than § 6050I to share

that information in the ordinary course of business. (Compl. ¶¶ 205–07). Many taxpayers who have numbered offshore bank accounts undoubtedly have the same desire for anonymity, yet Congress requires them to report their interest in those accounts yearly. See 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a). Taxpayers have no more right to keep secret behind a pseudonym represented by a string of numbers on an account on the Bitcoin blockchain than they do behind a pseudonym represented by a string of numbers on a numbered offshore bank account.

Moreover, payors conducting a business already have to collect that information from some payees on a Form W-4 or Form W-9 or for one of the many types of Forms 1099 and report their own personal information and the payees' information on a Form 1099 or Form W-2. In any event, the Supreme Court rejected the argument that imposing a statutory information collection requirement on a third party negates the application of the doctrine. Miller, 425 U.S. at 443 (holding that the Court's conclusion that the third-party doctrine bars a Fourth Amendment claim "is not changed by the mandate of the Bank Secrecy Act that records of depositors' transactions be maintained by banks").

The plaintiffs next assert that the third-party doctrine is "restricted to sharing of information that provides a 'limited' view of a person's affairs"[10] and that "heightened protection" applies to the information here. (Compl. ¶ 208). That is baseless. The plaintiffs rely largely on the Supreme Court's opinion in Carpenter v. United States. 138 S. Ct. 2206 (2018). The facts of Carpenter could hardly be more different. There, the government obtained 127 days of cell phone location data from the plaintiff's cell phone carrier, i.e., information not otherwise publicly available in any

---

[10] The plaintiffs lift a single word—"limited"—from Smith, 442 U.S. at 742, 744, in support of this proposition. But Smith mentions the "limited capabilities" of a phone pen register compared to a wiretap, not a rule that the government may only obtain a "limited view of a person's affairs" from a third party. The plaintiffs' attempt to graft a completely new concept onto the third-party doctrine from one word is too much.

form. The Court reaffirmed <u>Miller</u>, noting that "the third-party doctrine applies to telephone numbers and bank records." <u>Id.</u> at 2216. Yet it reasoned that cell phone location records are "unique" because they "provide[] an all-encompassing record of the holder's whereabouts." <u>Id.</u> at 2217. And that "all-encompassing record" reveals "not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" <u>Id.</u> And most importantly, "a cell phone logs a cell-site record by dint of its operation, without any affirmative act on the part of the user beyond powering up." <u>Id.</u> at 2220.

Records of receipts worth more than $10,000 received in the course of a trade or business are nothing like the cell phone location records in <u>Carpenter</u>. The plaintiffs do not allege the business transactions here reveal locations. Nor do they allege that payment data for or related to a business transaction holds "the privacies of life." And, unlike generating cell phone location records, transacting in Bitcoin is voluntary, and requires "affirmative act[s] . . . beyond powering up." <u>Gratkowski</u>, 964 F.3d at 312. In other words, they are far more like bank records revealing otherwise unreported taxable income than they are like cell phone data revealing everywhere a person went for 128 days. <u>Id.</u> Whatever the bounds of the third-party doctrine are, records of digital payments to a business are within them.

Finally, the plaintiffs argue that § 6050I's "$10,000 threshold" is simply too low for today's purposes. (Compl. ¶ 209). That objection is nonsensical; reporting requirements in other contexts are triggered by much smaller amounts. The threshold for reporting payments to a single person in a single year is only $600. 26 U.S.C. § 6041(a). The threshold for an exempt organization to report taxable unrelated business income is only $1,000 per year. 26 C.F.R. § 1.6012-2(e). And the threshold for charities to report certain donations is $5,000 per person per year. 26 C.F.R.

§ 1.6033-2(a)(2)(ii)(F). Concern regarding the reporting threshold in § 6050I must be addressed with Congress, not the courts.

> ii.    **The plaintiffs' allegations show that there are numerous circumstances in which section 6050I does not violate the Fourth Amendment, which precludes their facial challenge.**

Even if the plaintiffs had a reasonable expectation of privacy in transactions subject to § 6050I, and even if the third-party doctrine did not bar their Fourth Amendment claim, their facial challenge would still fail. That is because § 6050I as amended is constitutional in many circumstances, including some of the transactions that the plaintiffs allege in their complaint.

To succeed on a facial challenge, the plaintiffs must show there is "no set of circumstances" under which § 6050I would be valid or "show that the law lacks 'a plainly legitimate sweep.'" Am. for Prosperity Found. v. Bonta, 141 S. Ct. 2373, 2387 (2021) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987); Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 (2008)). But their own allegations show many such examples of transactions in which maintaining the type of absolute anonymity they demand here is not reasonable or even possible.

Take Carman. He alleges that he "intends to receive cryptocurrency as payment for services in his business as a Bitcoin consultant" from "small businesses." (Compl. ¶ 136). As discussed above, such transactions may be subject to other information reporting. For example, a business that pays $600 or more in any given year to another person (other than a corporation) in the course of their business must file a Form 1099 with the IRS for that person at the end of each tax year and provide a copy to the payee. 26 U.S.C. § 6041(a). So that the payors can file the Form 1099, the payor must obtain the payee's address, and taxpayer identification numbers (e.g., on a Form W-9). 26 U.S.C. § 6041(a); 26 C.F.R. § 1.6041-6(a). In other words, each year millions of business

payors and payees collect from each other and report to the IRS the very same "personal information" on which the plaintiffs premise their Fourth Amendment claim.[11]

Carman, for his part, does not even allege that he and his clients do business anonymously with each other. Nor does he address the fact—first raised in the United States' original motion to dismiss—that his business transactions are likely subject to other information reporting requirements. For example, when the clients compensate him for his consulting services in an amount far below $10,000, the client will be required to report the payment to the IRS and identify Carman as the recipient on a Form 1099. He omits any mention whether he has provided any of his clients with his taxpayer information, or whether any of them have issued him a Form 1099. The United States raised this obvious absence in the plaintiffs' pleading. Their silence as to whether Carman gives or receives Forms W-4, W-9, and/or 1099s speaks volumes. In any event, the plaintiffs cannot plausibly argue that two parties who exchange information on a Form W-9 and a Form 1099 and file the latter with the Service at the end of the year somehow retain a privacy interest in that same information. Put another way: that disclosure as to the same information defeats the plaintiffs' facial challenge.

Coin Center's allegations are similarly fraught. Coin Center alleges, as do the other plaintiffs, that "the parties to covered transactions do not even share the personal information in question with each other" and that "parties to cryptocurrency transactions may have no reason to share even their names with each other in the course of a transaction, let alone their Social Security numbers." (Compl. ¶ 205). Coin Center posits that § 6050I's requirements will deter its donors from making anonymous donations.

---

[11] Indeed, the information reporting regime is so well-established that Fourth Amendment challenges to them "might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." Cal. Bankers Ass'n, 416 U.S. at 60.

But based on the allegations of the complaint, that makes no sense for two reasons. First, Coin Center accepts cash donations too, yet the complaint is silent as to whether Coin Center currently files Forms 8300 for such cash receipts, or whether the existing requirement has deterred cash donors. Second, receipt of donations and receipt of cash (including digital assets) in the course of a trade or business are not the same thing. Coin Center is a tax-exempt organization under 26 U.S.C. § 501(c)(4). Section 501(c)(4) organizations are not required to report their donors' personal information to the IRS on their annual returns. 26 C.F.R. § 1.6033-2(a)(2)(ii)(F). But they are required to report receipt of $10,000 or more in cash when engaged in a trade or business.[12] The plaintiffs do not explain how any remittance can be both a donation not subject to disclosure *and* a receipt in the course of a trade or business. Merely alleging that Coin Center will "arguably be required to report its donor's" information, without more, does not suffice.

Further, Coin Center admits it "sells sponsorships for fundraising events [and] senders pay Coin Center in cryptocurrency worth over $10,000." (Compl. ¶ 150). Those "fundraising events" include Coin Center's annual dinner, at which some donors pay for "tables, sponsorships, and promotions." (Id.). Coin Center's website lists sponsors—along with their corporate logos—on the website for its annual dinner. See https://perma.cc/K5PR-FPRE.[13] So, contrary to Coin Center's suggestion, there are many transactions for which donors purposefully and voluntarily share their

---

[12] Tax-exempt entities must pay taxes for unrelated business taxable income ("UBIT") exceeding $1,000 in a tax year. 26 U.S.C. §§ 512–513. They report this income on a Form 990-T, and copies of the exempt organizations' Forms 990-T are publicly available on the internet via the IRS's tax-exempt organizations search tool ("TEOS"). Coin Center's Form 990s for the 2015-2018 years are available on TEOS, but there is no record on TEOS that Coin Center filed a Form 990-T for unrelated business taxable income for any of those years.

[13] "Qualified sponsorship payments" are not subject to UBIT, but other sponsorships may be. 26 U.S.C. § 513(i)(2). Again, the plaintiffs have not alleged facts sufficient to show whether the sponsorships and donations they are concerned with losing are taxable as UBIT or not.

personal information with Coin Center, and their identities with the public. Those public donors forfeited any expectation of privacy in those transactions, reasonable or otherwise. And if § 6050I can be constitutionally enforced against those donors (if indeed Coin Center receives such payments as part of a trade or business in exchange for goods or services), then the plaintiffs cannot prevail on their facial challenge.

> **2.** **The plaintiffs' First Amendment freedom of association claim cannot succeed because amended section 6050I withstands exacting scrutiny.**

As discussed *supra* at 13–15, the plaintiffs have not pled facts sufficient to show they will suffer any cognizable First Amendment injury. But even if they did, they have still failed to state a plausible claim that § 6050I's reporting requirements for business receipts violates the First Amendment because § 6050I easily withstands even the "exacting scrutiny" standard.

When a disclosure requirement burdens the freedom of association, a court applies "'exacting scrutiny,' which requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 366–67 (2010); see also Bonta, 141 S. Ct. at 2383; John Doe No. 1. v. Reed, 561 U.S. 186, 196 (2010). "Exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, [but] it does require that they be narrowly tailored to the government's asserted interest." Bonta, 141 S. Ct. at 2383. "Narrow tailoring" does not require a showing that the disclosure requirement is the "least restrictive means of achieving [the statute's ends]," but whether the law's objectives "cannot be served equally well in significantly less burdensome ways." Id.; see also Am. Party of Tex. v. White, 415 U.S. 767, 780–81 (1984).

The plaintiffs cannot dispute that ensuring compliance with income tax reporting requirements is a sufficiently important governmental interest. The government has a recognized important interest in tax administration (*i.e.*, the assessment and collection of tax revenue). Collett

v. United States, 781 F.2d 53, 55 (6th Cir. 1985) ("[T]he maintenance and viability of the tax system is a sufficiently important governmental interest to justify incidental regulation upon speech and non-speech communication."). When Congress enacted § 6050I, it was rightly concerned about both the underreporting of income, and the inherent undetectability of cash transactions.[14] As the Senate Budget Committee noted, "reporting on the spending of large amounts of cash will enable the Internal Revenue Service to identify taxpayers with large cash incomes." S. Rep. No. 98-300, at 121 (1983).

Instead, the plaintiffs allege that § 6050I is not narrowly tailored because the reporting regime is "universal[]" rather than tailored to only "reportable income or to activities with some heightened likelihood of criminality." (Compl. ¶ 236). They then suggest that subpoenas and audit letters are "less restrictive means" for advancing the government's interest in tax compliance. (Id.). None of these statements is true.

To start, § 6050I is not "universal." It is limited only to (1) trades or businesses, and (2) receiving $10,000 or more in cash or cash equivalents, or digital assets. A further limitation excludes monetary instruments drawn on the writer's account at a financial institution.

Next, the plaintiffs' argument that the reporting requirement could permissibly apply only to "reportable income" and still serve its purpose is illogical. The very tax administration problem that § 6050I seeks to solve is taxpayers' underreporting of difficult-to-detect income. Congress enacted § 6050I to require reporting of large business receipts in part so that it could determine a taxpayer's "reportable income." Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013, IRS Publication 1415, at 16–17 (Sept. 2019) (noting that income may not be

---

[14] From 2011-2013, the IRS estimates a total underreporting tax gap of $352 billion. Internal Revenue Service, Federal Tax Compliance Research: Tax Gap Estimates for Tax Years 2011-2013, Publication 1415, at 11, Internal Revenue Service (September 2019).

detected during audits "where taxpayers are intentionally noncompliant *or* conduct business in cash with poor or non-existent record keeping" (emphasis added)). Leaving it to taxpayers to determine in the first instance whether receipts are "reportable income" before filing a form complying with § 6050I does not solve that problem, it perpetuates it.

The claim that § 6050I could be limited to activities "with some heightened likelihood of criminality" and still somehow adequately serve the government's purposes fares no better. (Compl. ¶ 236). The government's interest is in ensuring correct reporting of income and payment of taxes due to the government. That is far broader than simply "detecting behavior that rises to the level of a crime." Not all tax underpayments are crimes. Compare 26 U.S.C. § 6662(a) (imposing accuracy-related civil penalty for certain understatements) with 26 U.S.C. § 7201 (felony to "willfully attempt . . . to evade or defeat any tax"). And even the fruits of illegal activities must be reported as income. IRS Publication 17 ("Income from illegal activities, such as money from dealing illegal drugs, must be included in your income on Schedule 1."); see also United States v. Hurley, 529 F. App'x 569, 574 (6th Cir. 2013). Therefore, limiting the reporting of business receipts only to activities likely to be crimes will necessarily miss other underreporting.

The plaintiffs' suggestion that subpoenas and audit letters are "less restrictive means" for receiving the same information, (compl. ¶ 236), is disingenuous at best. Plaintiffs admit—in fact they *tout*—that, absent § 6050I, parties can and would remain fully anonymous to one another. But just as with the otherwise anonymous cash transactions already subject to the reporting requirement of § 6050I, the Service cannot know *whom* to subpoena or to whom to issue an audit letter unless the parties to the transaction report it. Audit letters and subpoenas are supplements to—not substitutes for—§ 6050I.

In any event, the plaintiffs do not even suggest that these proposed limitations on § 6050I would somehow serve the government's interest in tax compliance "equally well," while burdening anyone's rights of association "significantly less." White, 415 U.S. at 781. None of the plaintiffs allege, for example, that if the statute was limited to "reportable income," they would no longer have to report the transactions they claim potentially reveal their expressive associations. And since using digital assets for business transactions on the Bitcoin blockchain or any other public cryptographic ledger is voluntary, the plaintiffs can certainly change their behavior to keep their commercial activities and their associational activities separate.

### 3. The plaintiffs' Fifth Amendment argument that the statute is void as vague fails because the statute puts ordinary people on notice as to what conduct is prohibited by law.

The plaintiffs next argue that the Court should overrule the will of Congress because § 6050I is void as vague under the Fifth Amendment. (Compl. ¶¶ 240–55). They posit a litany of reasons the statute cannot survive under any circumstances. (Id.). But the plaintiffs fail to carry the burden necessary to overcome "the strong presumptive validity that attaches to an act of Congress." United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963).

To start, the plaintiffs may only put forth a void-for-vagueness challenge on a facial basis when that challenge implicates the First Amendment. Magaw, 132 F.3d at 292 ("Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand." (quoting Maynard v. Cartwright, 486 U.S. 356, 361 (1988))). But none of the arguments raised by the plaintiffs in their void-for-vagueness section address concerns tethered to the First Amendment. (Compl. ¶¶ 240–55). So their complaint that the statute fails the void-for-vagueness test fails at the first hurdle, which requires such challenges to be brought on an as-applied basis. Magaw, 132 F.3d at 292 (quoting Maynard); see also United States v. Nasir, No.

5:12-cr-102-JMH, 2013 WL 5373625, at *1 (E.D. Ky. Sept. 25, 2013); United States v. Langfels, No. 13-cr-113-JMH, 2013 WL 5774954, at *2 (E.D. Ky. Oct. 25, 2013).

Notwithstanding this point, the plaintiffs' arguments would fail even if this Court could consider them. The plaintiffs' argument that the rules as currently constructed do not make sense when applied to digital assets only further illustrates why the Court should dismiss this suit as premature. Since the amendment of § 6050I(d) to include digital assets does not go into effect until January 1, 2024, it is not surprising that the Secretary has not yet updated the Form 8300 on which § 6050I transactions are reported to include digital assets. See 26 U.S.C. § 6050I(a) (Secretary may prescribe the return required); subsec. (b)(1) (Secretary determines form of return to be filed); and subsec. (b)(2)(D) (Secretary determines information contained on return). The Court should not speculate at this stage how § 6050I(d)(3) will operate when it comes into force.

But even ignoring this second fatal flaw cannot save the plaintiffs' claim. A void-for-vagueness challenge can only succeed if the relevant law "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application."[15] Roberts v. U.S. Jaycees, 468 U.S. 609, 629 (1984) (quoting Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)) (alteration in original). Courts are "extremely reluctant" to find statutes void as vague. United States v. Hofstetter, 31 F.4th 396, 412 (6th Cir. 2022). To prevail on a facial challenge, the plaintiffs must establish that any new § 6050I requirements will be vague in every circumstance. Vill. of Hoffman Estates, 455 U.S. at 494–95 (noting that a facial void-for-vagueness challenge can only succeed when the statute is unconstitutionally vague "in all of its applications").

---

[15] While courts may be more willing to find statutes vague when applied in a criminal context, that willingness is reduced when the statute contains a scienter requirement, which section 7203 does. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99 (1982).

36

Here, the plaintiffs have helpfully provided at least two examples where the statute can easily be applied to them. Carman cannot credibly suggest he is unaware that he must report his receipt of digital payments from others in the course of operating his business that exceed $10,000. (Compl. ¶ 136). And Walsh similarly knows that the purchase of mining machines that cost in excess of $10,000 from a person selling those machines in the course of her trade or business will trigger the reporting requirement. (Id. ¶ 161). Just these two examples render the statute constitutional under a facial challenge using the void-for-vagueness standard. And there are numerous other hypothetically valid applications of the statute. Given these reasons, this challenge cannot succeed.

### 4. The authority to enact section 6050I falls within Congress's enumerated powers because tax information reporting requirements are necessary and proper to Congress's exercise of its taxing and commerce powers.

The plaintiffs next argument asks this Court to overturn decades of precedent by ruling that Congress lacks the constitutional authority to include information reporting requirements in the Internal Revenue Code. (Compl. ¶¶ 257–65). As the director of Coin Center explained recently, "if the entire section 6050I has to go, that's fine with us." A Legal Challenge Over Crypto Reporting Could Strike Down Decades-Old Anti-Money Laundering Laws, The Verge (June 21, 2022), available at https://perma.cc/73YW-V3LW. (But see compl. ¶ 183 (disclaiming such a challenge)). While the plaintiffs are laudably forthright about their aims, none of the authorities they provide support the sea change in the law they seek.

The plaintiffs are not the first taxpayers to take issue with reporting requirements in the Sixth Circuit. The Court rejected as "wholly without merit" an argument that a statute requiring the filing of an information return exceeded Congress's taxing power under Article I, section 8 and the Sixteenth Amendment of the Constitution. Acker v. Comm'r, 258 F.2d 568, 572 (6th Cir.

1958), aff'd at 361 U.S. 87 (1959). The Sixth Circuit is not alone in roundly rejecting arguments

that the IRS lacks the authority to collect information from taxpayers reporting their income. See,

e.g., Lonsdale v. United States, 919 F.2d 1440, 1448 (10th Cir. 1990) ("As the cited cases, as well

as many others, have made abundantly clear," there is no authority to support the argument that

"individuals are not required to file tax returns fully reporting their income").

   Even if the § 6050I requirements did not fall directly within Congress's authority to tax

and spend, they would still be necessary and proper to Congress's carrying out its taxing power.

The necessary and proper clause gives Congress "great latitude in exercising its powers." Nat'l

Fed. of Indep. Bus. v. Sebelius, 567 U.S. 519, 537 (2012). This "permissive reading" of the clause

acknowledges that courts should be hesitant "to invalidate the acts of the Nation's elected leaders."

Id. at 537–38. Thus, laws that are "convenient," "useful," or "conducive" to the use of an

enumerated power fall within the necessary and proper clause. Id. at 559.

   The plaintiffs protest that the income tax "can" be implemented without § 6050I, and thus

the amendment falls outside the necessary and proper clause. (Compl. ¶ 263). But the necessary

and proper clause gives Congress "great latitude in exercising its powers." Nat'l Fed. of Indep.

Bus., 567 U.S. at 537. Courts are "very deferential" when reviewing Congress's use of its

legislative authority as necessary. Id. at 559. So the plaintiffs are simply wrong when they argue

that § 6050I is not necessary and proper if the government could "competently" administer the

Internal Revenue Code without it. (Compl. ¶ 263). Rather, courts look to whether the law is

"'convenient, or useful' or 'conducive' to the authority's 'beneficial exercise.'" United States v.

Comstock, 560 U.S. 126, 133–34 (2010) (quoting McColloch v. Maryland, 17 U.S. 316 (1819)).

   In applying that test, courts ask whether the law "constitutes a means that is rationally

related to the implementation of a constitutionally enumerated power." Id. at 134. It matters not

that Congress might have "adopted some other means for collecting the tax, which would prove less troublesome or annoying." Nicol v. Ames, 173 U.S. 509, 524 (1899); see also Comstock, 560 U.S. at 135 (quoting Burroughs v. United States, 290 U.S. 534, 548 (1934)). So long as Congress "has power to impose the tax, the means to be adopted for its collection, within reasonable and rational limits, must be a question for [C]ongress alone." Nicol, 173 U.S. at 528.

As noted above, the plaintiffs do not even attempt to show that § 6050I fails to meet this test. "The Taxing Clause and the Necessary and Proper Clause plainly do support prohibitions and mandates related to compliance with tax reporting, filing, and payment obligations . . . ." Seven-Sky v. Holder, 661 F.3d 1, 49 n.39 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); see also Nat'l Fed. of Indep. Bus., 567 U.S. at 546 (disagreeing with a different portion of the analysis in then-Judge Kavanaugh's dissent). And the Supreme Court has held as much in other tax contexts. For instance, the Court upheld a congressional requirement that gambling establishments register their ownership with the IRS as a valid exercise of the necessary and proper clause. United States v. Kahringer, 345 U.S. 22, 31 (1953) (upholding registration requirement that establishments provide their "names, addresses, and places of business"), overturned in part on other grounds by Marchetti v. United States, 390 U.S. 39, 54 (1968). It did the same in cases involving a tax registration provision for firearm sellers and a statute requiring sellers to report information related to sales covered by a stamp tax. Sonzinsky v. United States, 300 U.S. 506, 513 (1937) ("[A]n Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed."); see also Nicol, 173 U.S. at 509.

The Commerce Clause also provides a constitutional authorization for § 6050I. That provision permits Congress to enact legislation that regulates interstate commercial activity. Nat'l

Fed. of Indep. Bus., 567 U.S. at 550. That is exactly what Congress did here, and nothing about cryptocurrency disturbs this analysis. As noted earlier, the terms of § 6050I require reporting when transactions occur in a taxpayer's "trade or business." Because such activity is economic in nature, the aggregation principle applies. See United States v. Morrison, 529 U.S. 598, 610 (2000). So even individual cryptocurrency transactions that occur entirely intrastate will have a sufficient aggregate impact on interstate commerce to justify federal regulation.

### 5. The statute does not implicate the Fifth Amendment's protection against compelled self-incrimination.

It is beyond dispute that the Fifth Amendment's protection against self-incrimination does not protect "against the compelled production not just of incriminating testimony, but of any incriminating evidence." (Compl. ¶ 267 (quoting United States v. Hubbell, 530 U.S. 27, 49 (2000) (Thomas, J., concurring))). And indeed, the plaintiffs concede the point. (Compl. ¶ 268 (citing Hubbell, 530 U.S. at 34)).

## V.    Conclusion.

At bottom, this suit asks the Court to rule that the Constitution allows businesses to avoid the requirement that they disclose certain large business transactions to the Internal Revenue Service by using cryptocurrency. But the presumption of constitutional validity that attaches to congressional legislation "is particularly true of a revenue act of [C]ongress." Nicol, 173 U.S. at 515. Section 6050I is no different than the myriad other reporting requirements in the Internal Revenue Code. There is no constitutional basis to disturb this or any other tax-reporting requirement. The Court should dismiss this suit in full.

Date:   December 12, 2022

DAVID A. HUBBERT
Deputy Assistant Attorney General

*/s/ Kyle L. Bishop*
KYLE L. BISHOP
RYAN O. MCMONAGLE
MOIRA E. GOODWIN
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-616-1878 (KLB)
202-514-6866 (fax)
Kyle.L.Bishop@usdoj.gov