**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

|  |  |
|---|---|
| DAN CARMAN, COIN CENTER, RAYMOND WALSH, QUIET INDUSTRIES CORP.,<br><br>               Plaintiffs,<br><br>v.<br><br>JANET YELLEN, in her official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF TREASURY; CHARLES RETTIG, in his official capacity as Commissioner of the Internal Revenue Service; INTERNAL REVENUE SERVICE; MERRICK GARLAND, Attorney General, in his official capacity; UNITED STATES OF AMERICA,<br><br>               Defendants. | Case No. 5:22-cv-149-KKC<br><br>Judge Karen K. Caldwell |

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 9

    I.    This Court has jurisdiction. ................................................................................. 10

        A.    The plaintiffs plausibly alleged standing. ................................................... 10

        B.    The plaintiffs' claims are ripe. .................................................................... 18

    II.    The plaintiffs have alleged plausible claims. ...................................................... 21

        A.    The reporting mandate violates the First Amendment. ............................... 21

            1.    The reporting mandate triggers exacting scrutiny. ........................... 21

            2.    The reporting mandate cannot overcome exacting scrutiny............... 23

        B.    The reporting mandate violates the Fourth Amendment............................. 28

            1.    The reporting mandate is a search. .................................................. 29

            2.    The search is unreasonable. ............................................................. 35

            3.    There is no barrier to a facial challenge. ......................................... 35

        C.    The reporting mandate is unconstitutionally vague................................... 37

        D.    The reporting mandate exceeds Congress's enumerated powers. ............... 39

        E.    The reporting mandate unconstitutionally compels self-incrimination............... 40

CONCLUSION ....................................................................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab's v. Gardner*, 387 U.S. 136 (1967) ............................................................... 18

*Acker v. Comm'r*, 258 F.2d 568 (6th Cir. 1958) ............................................................. 39

*Aid for Women v. Foulston*, 441 F.3d 1101 (10th Cir. 2006) .......................................... 11

*Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467 (S.D.N.Y. 2019) ................... 29, 30

*Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373 (2021) .................................... passim

*Baldwin v. Comm'r*, 648 F.2d 483 (8th Cir. 1981) .......................................................... 23

*Barber v. Charter Twp. of Springfield*, 31 F.4th 382 (6th Cir. 2022) ............................. 13

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977) ....................................................... 22

*Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) ............. 12

*Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102 (1974) ........................................... 19

*Bond v. United States*, 572 U.S. 844 (2014) ................................................................... 40

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006) ..................................... 24

*Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) ..................................................... 23

*Broughton v. United States*, 632 F.2d 706 (8th Cir. 1980) ............................................. 39

*Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974) ....................................................... 2, 11

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ................................................. passim

*Chabad of S. Ohio v. Cincinnati*, 363 F.3d 427 (6th Cir. 2004) ..................................... 11

*Chandler v. Miller*, 520 U.S. 305 (1997) ........................................................................ 29

*CHKRS, LLC v. City of Dublin*, 984 F.3d 483 (6th Cir. 2021) ....................................... 20

*Citadel Sec. LLC v. SEC*, 45 F.4th 27 (D.C. Cir. 2022) ................................................. 14

*City of Kennett v. EPA*, 887 F.3d 424 (8th Cir. 2018) ................................................... 13

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .......................................................... 12

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ............................................................. passim

*City of Ontario v. Quon*, 560 U.S. 746 (2010) ............................................................. 35

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................... 12, 17

*Clinton v. City of New York*, 524 U.S. 417 (1998) ............................................... 16

*Collett v. United States*, 781 F.2d 53 (6th Cir. 1985) ............................................... 26

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017) ............................ 15

*Craig v. Boren*, 429 U.S. 190 (1976) ............................................................. 11

*Crawford v. Treasury*, 868 F.3d 438 (6th Cir. 2017) ........................................ 2, 11, 12, 15

*Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464 (7th Cir. 2012) ................. 11

*Davis v. FEC*, 554 U.S. 724 (2008) ............................................................. 2, 11, 15

*Dominion Nat. Bank v. Olsen*, 771 F.2d 108 (6th Cir. 1985) ............................ 16

*Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59 (1978) ..................... 19

*East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220 (6th Cir. 1995) ............ 23

*Ex Parte Jackson*, 96 U.S. 727 (1877) ............................................................. 35

*Familias Unidas v. Briscoe*, 619 F.2d 391 (5th Cir. 1980) ............................... 23

*Fischer v. Thomas*, 52 F.4th 303 (6th Cir. 2022) ............................................... 18

*Flanory v. Bonn*, 604 F.3d 249 (6th Cir. 2010) ............................................... 9

*Florida v. Jardines*, 569 U.S. 1 (2013) ............................................................. 34

*Gerber v. Herskovitz*, 14 F.4th 500 (6th Cir. 2021) ........................................ 13

*GMC v. Tracy*, 519 U.S. 278 (1997) ............................................................. 16

*Green v. Raleigh*, 523 F.3d 293 (4th Cir. 2008) ............................................... 11

*Halbig v. Burwell*, 758 F.3d 390 (D.C. Cir. 2014) ............................................... 12

*Hale v. Henkel*, 201 U.S. 43 (1906) ............................................................. 29

*Hill v. Snyder*, 878 F.3d 193 (6th Cir. 2017) ............................................... 20

*Horne v. Flores*, 557 U.S. 433 (2009) ...................................................................................11

*Huish Detergents, Inc. v. Warren Cty.*, 214 F.3d 707 (6th Cir. 2000) ...................................16

*In re First National Bank*, 701 F.2d 115 (10th Cir. 1983) ...................................................23

*In re PHE, Inc.*, 790 F. Supp. 1310 (W.D. Ky. 1992) .........................................................12

*Johnson v. United States*, 576 U.S. 591 (2015) ...............................................................20, 38

*Kanuszewski v. Mich. HHS*, 927 F.3d 396 (6th Cir. 2019) ..............................................12, 15

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) ..........................................................passim

*Kiser v. Reitz*, 765 F.3d 601 (6th Cir. 2014) .................................................................19, 20

*Klimas v. Comcast Cable Commc'ns*, 465 F.3d 271 (6th Cir. 2006) ......................................15

*Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361 (6th Cir. 1998) ..................28

*Kyllo v. United States*, 533 U.S. 27 (2001) .............................................................10, 30, 32

*Lac Vieux Desert Band v. Mich. Gaming Control Bd.*, 172 F.3d 397 (6th Cir. 1999) ...........13, 16

*Linton ex rel. Arnold v. Comm'r of Health & Env't*, 973 F.2d 1311 (6th Cir. 1992).................16

*Lonsdale v. United States*, 919 F.2d 1440 (10th Cir. 1990) ..................................................39

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ..............................................................11, 12

*McGowan v. Maryland*, 366 U.S. 420  (1961) .....................................................................13

*Mediacom Southeast LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396 (6th Cir. 2012)...........14, 23, 24

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007)....................................................16

*Messer v. Jackson Cty.*, 2020 WL 5412480 (E.D. Ky. Sept. 9) .............................................28

*NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958) ........................................................23

*NFIB v. Sebelius*, 567 U.S. 519 (2012)..........................................................................passim

*NRA v. Magaw*, 132 F.3d 272 (6th Cir. 1997)...........................................................11, 13, 17

*Parsons v. DOJ*, 801 F.3d 701 (6th Cir. 2015) ..............................................................passim

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) ........................................................15

*Republican Party of La. v. FEC*, 219 F. Supp. 3d 86 (D.D.C. 2016) ............................................11

*Riley v. California*, 573 U.S. 373 (2014)...............................................................30, 31, 32, 35

*Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014).....................................................................14

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ......................................................................... 37, 38

*Seven-Sky v. Holder*, 661 F.3d 1 (D.C. Cir. 2011) ...................................................................39

*Sierra Club v. EPA*, 793 F.3d 656 (6th Cir. 2015)......................................................................9

*Sonzinsky v. United States*, 300 U.S. 506 (1937) ......................................................................39

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...................................................................... 12, 15

*State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48 (D.C. Cir. 2015) .........................................9, 11

*Suitum v. Tahoe Reg. Planning Agency,* 520 U.S. 725 (1997)....................................................19

*Thomas More L. Ctr. v. Obama*, 651 F.3d 529 (6th Cir. 2011) ...................................................19

*Thomas v. Bright*, 937 F.3d 721 (6th Cir. 2019) ......................................................................23

*Truesdell v. Friedlander*, 2020 WL 5111206 (E.D. Ky. Aug. 31) ...............................................13

*United States v. Bell*, 414 F.3d 474 (3d Cir. 2005) ....................................................................12

*United States v. Chadwick*, 433 U.S. 1 (1977) ..........................................................................31

*United States v. Citizens State Bank*, 612 F.2d 1091 (8th Cir. 1980) ..........................................23

*United States v. Davis*, 139 S. Ct. 2319 (2019) .................................................................passim

*United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501 (2d Cir. 1991) ...................................12

*United States v. Gratkowski*, 964 F.3d 307 (5th Cir. 2020) .................................................7, 33, 34

*United States v. Haddix*, 239 F.3d 766 (6th Cir. 2001)..........................................................1, 10, 30

*United States v. Hubbell*, 530 U.S. 27 (2000).........................................................................40

*United States v. Kahriger*, 345 U.S. 22 (1953) ........................................................................39

*United States v. Miller*, 425 U.S. 435 (1976).....................................................................33, 34

*United States v. Miller*, 982 F.3d 412 (6th Cir. 2020) ...............................................................35

*United States v. Morrison*, 529 U.S. 598 (2000) ................................................................. 39

*United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994) ......................................................... 12

*United States v. Stevens*, 559 U.S. 460 (2010) .................................................................. 18

*United States v. Sullivan*, 274 U.S. 259 (1927) ................................................................ 20

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) .......................................31, 32, 34, 36

*United States v. Windsor*, 570 U.S. 744 (2013) ................................................................ 12

*Vonderhaar v. Vill. of Evendale*, 906 F.3d 397 (6th Cir. 2018) ....................................... 12, 18

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................ 19

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565 (6th Cir. 2008) ............................ 14

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ..................................................... 24

**Statutes**

26 C.F.R. §1.6050I-1(b) .............................................................................................. 7, 9

26 C.F.R. §1.6050I-1(c) ................................................................................................. 4

26 C.F.R. §1.6050I-1(e) ......................................................................................... 5, 7, 22

26 C.F.R. §1.6050I-1(f) .................................................................................................. 5

26 U.S.C. §6001 ........................................................................................................... 32

26 U.S.C. §6041 ........................................................................................................... 32

26 U.S.C. §6045(g)(3)(D) .............................................................................................. 5

26 U.S.C. §6050I ................................................................................................... passim

26 U.S.C. §6050I(a) ....................................................................................................... 4

26 U.S.C. §6050I(b) ............................................................................................... passim

26 U.S.C. §6050I(d) ....................................................................................................... 5

26 U.S.C. §6050I(e) .................................................................................................. 5, 22

26 U.S.C. §6050I(f) ........................................................................................................ 6

26 U.S.C. §6103 ............................................................................................... passim

26 U.S.C. §6103(a) ............................................................................................ 6, 32

26 U.S.C. §6103(l)(15) ..................................................................................... passim

26 U.S.C. §6721(a) .................................................................................................. 6

26 U.S.C. §6721(e) .................................................................................................. 6

26 U.S.C. §6722(e) .................................................................................................. 6

26 U.S.C. §7203 ................................................................................... 6, 18, 32, 37

Pub. L. 98–369 (1984) ......................................................................................... 39

Pub. L. 100–690 (1988) ....................................................................................... 39

Pub. L. 104–168 1452 (1996) ............................................................................. 39

Pub. L. 117-58 (2021) ....................................................................................... 9, 39

## Other Authorities

13B Wright & Miller §3532.2 (3d ed. 2022) ...................................................... 20

Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2009), bit.ly/3uwVr5J ...................... 3, 4, 22, 31

## INTRODUCTION

A provision in the 2021 Infrastructure Investment and Jobs Act mandates that users of cryptocurrency—an online medium of exchange—report the details of their transactions to the government. Because of how cryptocurrency works, a transaction reported under this new provision will give the government access to unrelated transactions, past and future, including ones that reveal individuals' most expressive and private associations. From one transaction report in 2024, the government can learn that a person donated a small amount to a local mosque in 2016, paid for a son's sobriety treatment in 2018, contributed to a charitable organization in 2020, or hired a marriage counselor in 2022. Unlike traditional tax reports, these new reports can be freely shared with state, local, federal, and even foreign law enforcement. And unlike traditional tax-reporting requirements, violation of this reporting mandate is a felony. The new provision also requires the impossible, making cryptocurrency users verify the personal identity of senders who often are anonymous or are automated processes with no identifiable operators at all. Failure to identify and report these unidentifiable senders will result in severe penalties.

The government might seek this brave new world, but the Constitution does not allow it. The reporting mandate violates the First Amendment because it compels the disclosure of protected associations and "casts a dragnet" for sensitive information, triggering exacting scrutiny that it cannot overcome. *Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021). It violates the Fourth Amendment because it compels, without a warrant, sensitive disclosures of "personal affairs," *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001), business records, *City of Los Angeles v. Patel*, 576 U.S. 409 (2015), and "familial, political, professional, religious, and sexual associations," *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018). And it is unconstitutionally vague because its impossible demands will flummox people of "common intelligence." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Finally, and perhaps unsurprisingly, the mandate is beyond Congress's enumerated powers because it

is a "great substantive and independent power" untethered to the power to collect income tax. *NFIB v. Sebelius*, 567 U.S. 519, 561 (2012) (controlling op. of Roberts, C.J.).

The government, for its part, argues that the plaintiffs cannot challenge the reporting mandate at all. But if these plaintiffs cannot, then nobody can. The plaintiffs are all cryptocurrency users who engage in transactions subject to the mandate. As a result, they will be forced to submit reports, incur thousands of dollars in compliance costs, reveal their private information, change their behavior, and face the prospect of steep penalties. And because the reporting mandate applies to transactions that are happening now, the plaintiffs are injured now. Individuals and entities who are subject to a reporting mandate of course have standing to challenge it. *Davis v. FEC*, 554 U.S. 724, 733 (2008); *Bonta*, 141 S. Ct. 2373; *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 68 (1974); *Crawford v. Treasury*, 868 F.3d 438, 458 (6th Cir. 2017). The government cites zero cases saying otherwise. The plaintiffs deserve what the government does not want—a ruling, after cross-motions for summary judgment, on whether the new reporting mandate is unlawful.[1]

## BACKGROUND

In 2021, President Biden and Congress amended a little-known tax-reporting mandate to create an enormous new power. The amendment plopped a legal regime that governs physical cash onto cryptocurrency, with little appreciation of the differences between cash and cryptocurrency or the privacy consequences of treating them the same.

**Cryptocurrency.** Cryptocurrency is a digital medium of exchange. It uses open-source software to allow people to transact with each other directly, securely, and privately. Am.Compl. (Doc. 27) ¶¶44-45. It has been embraced by millions of Americans, and by leaders across the political spectrum, especially in Kentucky. ¶¶73-79, 83-88.

---

[1] The plaintiffs join the government in requesting oral argument. *See* Mot. (Doc. 29) at 1.

2

A few facts about how cryptocurrency works: To transact with each other, cryptocurrency users assign themselves "addresses." ¶47. Addresses are random-looking strings of letters and numbers—like "XYZ123" or "ABC555," but longer. ¶47. Users send and receive cryptocurrency through their addresses. *Id.* To make a transaction, a sender authorizes a payment from his address to another person's address. ¶¶47-49. That transaction is validated as mathematically correct by workers called "miners." ¶50. Miners receive new cryptocurrency automatically from the software as a reward for validating transactions. ¶51.

Once a cryptocurrency transaction is validated, it is posted to a "public ledger." ¶52-53. The public ledger shows the addresses of the sender and receiver, the quantity of cryptocurrency transferred, and the time of the transaction. ¶¶52, 66. In other words, it shows pseudonymous, random-looking alphanumeric strings, not personal identities. ¶52, 54, 66. When two people make a cryptocurrency transaction, the transaction is posted to the public ledger in a form like this:

[Date and time] [Amount] XYZ123 → ABC555

While everybody can view any and all transactions on a public ledger, only the participants typically know that the transaction is theirs. ¶67. The user who assigned himself "XYZ123," for instance, can view the public ledger and confirm that he successfully sent cryptocurrency. *Id.* But to onlookers, the addresses could belong to anyone. *Id.* A cryptocurrency user can make a transaction without sharing his personal identifying information with anyone—not with the other user, not with miners, not with a bank, and not with anyone else. ¶55. When his transaction is posted to the public ledger, he therefore may be the only one who knows that the transaction is his. *Id.* As far as an onlooker can tell from the public ledger, the random-looking alphanumeric string could belong to his next-door neighbor or to someone in Australia. ¶67. This is cryptocurrency's "new privacy model." Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*, 6 (2009), bit.ly/3uwVr5J; Am.Compl. ¶¶55-72.

3

But this "new privacy model" works only when users are not compelled to reveal their personal identifying information in connection with a transaction. Am.Compl. ¶¶57-59, 69; *see also* Nakamoto, *supra*, at 6. If a person is compelled to report that a cryptocurrency transaction on the public ledger was made by him—*i.e.*, that "XYZ123" means "Bob Smith, 1 Elm Street, Social Security number 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"—then anyone can go to the public ledger, search for all the transactions made by "XYZ123," and know that they were made by Bob. Those past transactions will include unreported, previously private transactions made years earlier—including his most intimate, private, and expressive associations. ¶¶12-13, 58-60, 69. The public ledger remains viewable forever and will show every transaction ever made by "XYZ123."

Although users can take steps to make it harder to link their reported transaction to their other unreported transactions, those steps are not ordinarily taken and are often insufficient. Am.Compl. ¶61. For example, although a user can assign himself different addresses to use in different transactions, public ledger analysts can identify different addresses controlled by the same person. ¶61 (citing Complaint at ¶¶14-19, *United States v. 155 Virtual Currency Assets*, 2021 WL 1340971 (D.D.C. Apr. 9) (explaining that the government makes these connections)). A law compelling cryptocurrency users to reveal their personal identifying information in connection with a transaction would give the government access to their years-earlier, unrelated, private, and expressive transactions.

**The reporting mandate.** That's what the reporting mandate at issue in this case does. The mandate amended a physical-cash law, enacted in 1984, that mainly required persons engaged in trades or businesses to report their receipt of over $10,000 in "cash." 26 U.S.C. §6050I(a). The "cash" that was subject to §6050I generally meant physical "coin" or "currency." 26 C.F.R. §1.6050I-1(c)(1)(ii)(A). In other words, on those rare occasions when someone received over $10,000 of physical coins or dollar bills in the course of his trade or business, the receiver would be required to submit a report to

the government providing highly detailed information about the parties to the transaction and about the transaction itself.

The 2021 Infrastructure Investment and Jobs Act amended the definition of "cash" in 26 U.S.C. §6050I to include, counterintuitively, "digital assets." 26 U.S.C. §6050I(d). Digital assets mean cryptocurrency. 26 U.S.C. §6045(g)(3)(D). The reporting mandate transplants the §6050I statutory and regulatory regime that has long applied to physical cash and imposes those same rules on transactions involving cryptocurrency.

The rules now imposed on cryptocurrency will be onerous. First, the receiver in a covered transaction must reveal to the IRS his own Social Security number, his name, and his address. 26 C.F.R. §1.6050I-1(e)(2); *see also* Form 8300 (Doc. 29-2) at 1. Second, the sender must reveal his Social Security number, name, and address to the receiver. 26 U.S.C. §6050I(b). The receiver cannot take the sender's word for it, but must instead take steps to "verify the identity" of the sender by reviewing the sender's passport, driver's license, or similar documentation. 26 C.F.R. §1.6050I-1(e)(3)(ii). Third, the receiver must report to the IRS the amount of digital assets that he received, the "nature" of the transaction, and the exact date of the transaction. 26 U.S.C. §6050I(b)(2); 26 C.F.R. §1.6050I-1(e)(2). Fourth, the receiver must enter all that verified information on a report to send to the IRS. He must sign the report under penalty of perjury and mail it to the IRS within 15 days of the transaction. 26 C.F.R. §1.6050I-1(e)(1).

After he has submitted the report, the receiver must send a yearly written statement to each sender, including the receiver's name and address along with the details of their covered transactions. 26 U.S.C. §6050I(e); 26 C.F.R. §1.6050I-1(f). The receiver has to maintain possession of every report for five years. 26 C.F.R. §1.6050I-1(e)(3)(iii). This entire process repeats for each new covered transaction.

Unlike other tax reports, reports under the reporting mandate may be freely shared by the IRS with local, state, federal, and foreign law enforcement agencies for any purposes. 26 U.S.C. §6103(l)(15). Most tax reports are strictly confidential. 26 U.S.C. §6103(a). If a law enforcement officer accesses another tax report, he is not allowed to use it "in any manner in connection with" his law-enforcement role. *Id.* But under a section entitled "[d]isclosure of returns and return information for purposes other than tax administration," federal law creates a singular carve-out for "disclosure of returns filed under section 6050I"—*i.e.*, the reporting mandate statute. *Id.* §6103(l)(15). That carve-out says that the IRS can freely "disclose to officers and employees of (A) *any* Federal agency (B) *any* agency of a State or local government, or (C) *any* agency of the government of a *foreign* country" any "information contained on returns filed under §6050I," but no others. *Id.* (emphases added). To acquire cryptocurrency transaction reports, any law enforcement agency can just send a "written request." *Id.*

Also, unlike other tax-reporting requirements, non-compliance with the reporting mandate is a felony. Under 26 U.S.C. §7203, a willful violation of "any provision of section 6050I" is a "felony" punishable by five years in prison. A willful violation of all other tax-reporting requirements is a "misdemeanor" punishable by one year in prison. *Id.* A person commits a felony under the reporting mandate if he willfully (as a sender) prevents the receiver from filing a full and correct report or (as a receiver) fails to file a required report or even just files a report containing a "material omission or misstatement of fact." 26 U.S.C. §§6050I(f)(1), 7203. He also commits a felony if he willfully "structure[s]" a transaction to avoid reporting. *Id.* §6050I(f)(1)(C). Other penalties are available too, including steep fines. 26 U.S.C. §§6721(e)(2)(C), 6721(a), 6721(a)(1), 6722(e).

The reporting mandate reaches many transactions. First, nonprofits and individuals can receive payments in the course of a "trade or business" because that term is defined broadly. Compl. ¶¶32-33. It covers, for example, contributions from donors. *Id.* And second, although a report need

only be filed once the "$10,000" threshold is met, the mandate affects a wide range of payments at much smaller dollar values because it requires a receiver to keep track of whether any given transaction is "related" to any number of other transactions—including transactions up to a full year earlier or later—that, when combined, amount to over $10,000. 26 C.F.R. §1.6050I-1(b)(2).

**Effects.** The reporting mandate will compel cryptocurrency users to compile and produce reports that let the government identify their personal transactional histories on the public ledger. ¶¶106-14. The reports will allow the government to identify an individual's address and then ascertain the other, unrelated activities of that individual, regardless of the amount involved or time when they occurred. ¶107. The government already employs these methods and knows that the reporting mandate will enable this widespread surveillance. ¶¶109-113.[2] The mandate thus will expose to the government users' detailed and intimate transaction histories and most private and expressive associations. ¶¶114, 124, 190-92, 229-32. It will expose those same transaction histories to others with access to the reports, including law-enforcement agencies worldwide. ¶¶120, 233.

The mandate will also demand the impossible of those subject to it. It will require them to verify the driver's license, passport, or similar form of identification of people who live across the country or of huge numbers of people all at once. ¶119; 26 C.F.R. §1.6050I-1(e)(3)(ii). It will require them to identify and report the personal information of the "person" from whom they received cryptocurrency, but that can be impossible. ¶126. For example, a miner receives cryptocurrency from cryptocurrency software itself, not any person at all, because a miner is automatically rewarded with new cryptocurrency when she performs mathematically verifiable work to secure the public ledger. *Id.*

---

[2] *E.g.*, Brief for United States, *United States v. Gratkowski*, 964 F.3d 307 (5th Cir. 2020), at 7-8. ("law enforcement has used these services in numerous past investigations and found it to produce reliable results"); Complaint at ¶¶14-19, *155 Virtual Currency Assets*, 2021 WL 1340971 (D.D.C. Apr. 9) (similar).

These difficulties, intrusions, and penalties have already and will cause many people to refrain from using cryptocurrency. ¶¶125-28.

**The plaintiffs.** The plaintiffs use cryptocurrency in a variety of ways that will be upended by the reporting mandate. Dan Carman, a businessman and lawyer in Lexington, uses it in business transactions as a cryptocurrency consultant, receives it as a miner, and sends it in purchases and transactions. ¶¶134-47. Some of these transactions or related transactions exceed $10,000. *Id.* Mr. Carman also "donates to organizations that speak for the cryptocurrency community," "regularly contributes to religious organizations, tithes to his community church, and intends to do so in the future using cryptocurrency." ¶139. Another plaintiff Coin Center, a cryptocurrency nonprofit, receives high-value cryptocurrency payments as anonymous contributions, standard contributions, and sponsorships for events. ¶¶148-56. And the other plaintiffs, Raymond Walsh and Quiet Industries, buy mining machines using cryptocurrency and mine large quantities of cryptocurrency, including in transactions or related transactions over $10,000. ¶¶156-76.

As senders and receivers of qualifying cryptocurrency transactions, all four plaintiffs are direct objects of the reporting mandate. ¶¶94-104, 136-38, 140-41, 147, 149-51, 156, 160-62, 164, 167-68, 170-73, 176. They will all incur compliance costs as a result of the mandate. ¶¶145, 147, 154, 156, 165-66, 170, 174, 176, 179. They will have their private information disclosed as a result of the mandate. ¶¶19, 106-14, 120-21, 140, 143, 144, 146, 151, 162, 167. They will suffer economic harm as a result of the mandate. ¶¶106-28, 142, 153, 175. And they will face the prospect of enforcement. ¶¶32-33, 129-32, 137, 152, 155, 160, 171, 179, 244.

The plaintiffs do not otherwise disclose the personal information of the parties to all of their transactions to the public. ¶178. Nor do they share that information voluntarily with all of the other parties with whom they transact. ¶177. But as a result of the mandate, that information—as well as the personal transactional histories that it will expose—will all be revealed. ¶¶146, 177-78.

The mandate will take effect for reports due on January 1, 2024. Pub. L. 117-58, §80603 (2021). The mandate will go into effect by operation of law and does not depend on any future rulemaking. ¶¶36, 181. Because related transactions subject to the mandate can occur up to one year apart, 26 CFR §1.6050I-1(b), activities happening now are reportable to the government. Am.Compl. ¶180. And because reports compelled by the mandate will reveal transactions from many years earlier, the mandate is chilling activities now. ¶182.

**This lawsuit.** The plaintiffs filed this lawsuit seeking a declaration that the reporting mandate is facially unconstitutional and an injunction preventing the government from enforcing it. *Id.* at 76. The government moved to dismiss for lack of jurisdiction and failure to state a claim. Mot. (Doc. 29) & Mem. (Doc. 29-1).

## ARGUMENT

The motion-to-dismiss standard warrants emphasis, since the government's arguments frequently dishonor it. "For purposes of ruling on a motion to dismiss" for failure to state a claim or lack of jurisdiction, "both the trial and reviewing courts must *accept as true all* material allegations of the complaint, and must construe the complaint *in favor of* the complaining party." *Parsons v. DOJ*, 801 F.3d 701, 710 (6th Cir. 2015) (emphases added). "A motion to dismiss for failure to state a claim is a test of the plaintiffs' cause of action as stated in the complaint, not a challenge to the plaintiffs' factual allegations." *Flanory v. Bonn*, 604 F.3d 249, 252 (6th Cir. 2010). The motion-to-dismiss analysis "must be confined to the four corners of the complaint." *Parsons*, 801 F.3d at 706. And "on a motion to dismiss," courts must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Sierra Club v. EPA*, 793 F.3d 656, 662 (6th Cir. 2015).

This Court should deny the government's motion to dismiss. The plaintiffs have standing because the reporting mandate "impose[s] disclosure requirements" on them. *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015) (Kavanaugh, J.). And their facial constitutional

challenges to this statute are quintessentially ripe. On the merits, the government identifies no legal defect requiring dismissal at this early stage. The plaintiffs plausibly alleged that the mandate violates the First Amendment under *Bonta*, which held that disclosure requirements that expose associations must overcome exacting scrutiny—something that the government cannot do, especially at the motion-to-dismiss stage. The mandate also conducts unconstitutional "searches" under the Fourth Amendment because it exposes "intimate" and "personal affairs" without a warrant. *Kyllo v. United States*, 533 U.S. 27, 37 (2001); *Haddix*, 239 F.3d at 767; *Carpenter*, 138 S. Ct. at 2217. The reporting mandate is unconstitutionally vague, moreover, because it demands the impossible of cryptocurrency users. And it violates Article I because it is a "great substantive and independent power" untethered to Congress's power to collect income tax. *NFIB*, 567 U.S. at 561 (controlling op. of Roberts, C.J.).

This Court should deny the government's motion and let this case proceed to dispositive cross-motions for summary judgment.

## I.     This Court has jurisdiction.

The government claims that the plaintiffs failed to allege standing or ripeness. It is wrong on both fronts.

### A.  The plaintiffs plausibly alleged standing.

"To have standing, a plaintiff must 'present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling.'" *Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support

the claim." *Parsons*, 801 F.3d at 710. "[O]nly one plaintiff needs to have standing in order for the suit to move forward." *Id*.[3]

A plaintiff who will be subject to a reporting mandate has standing to challenge that mandate. A plaintiff "has standing to challenge [a] disclosure requirement" if he alleges that the requirement "force[s]" his information to be "disclosed." *Davis v. FEC*, 554 U.S. 724, 733 (2008). He need only allege that he "engage[s] in the type of … transaction which would necessitate that [someone] report it to the Government." *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 68 (1974). "[T]here is little doubt about the existence of standing to challenge … reporting requirements" where the "plaintiff is subject to those reporting obligations." *Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 92 (D.D.C. 2016). This conclusion follows from the principle that standing is "ordinarily little question" when the plaintiff is "an object" of the government regulation being challenged. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992); *accord NRA v. Magaw*, 132 F.3d 272, 281 (6th Cir. 1997); *Craig v. Boren*, 429 U.S. 190, 194 (1976). So if a plaintiff will be "subject to the individual-reporting requirement" that he challenges, he has standing. *Crawford v. Treasury*, 868 F.3d 438, 458 (6th Cir. 2017).[4]

---

[3] The government says that if one plaintiff has standing, then this Court must assess the standing of all remaining plaintiffs and "dismis[s]" any plaintiff who lacks standing. Mem. 8, 12. Although the point is academic because all four plaintiffs here have standing, the government is mistaken. The "critical question" is "whether at least one [plaintiff] has alleged" standing. *Parsons*, 801 F.3d at 710 (quoting *Horne v. Flores*, 557 U.S. 433, 446-47 (2009)). The government's only contrary authority is a footnote saying that courts should "limit *relief*" to those plaintiffs who have standing. *Kentucky v. Yellen*, 54 F.4th 325, 341 n.12 (6th Cir. 2022) (emphasis added). That point is irrelevant at the motion-to-dismiss stage where the plaintiffs are not asking for any relief—and will remain irrelevant in a facial challenge like this one since all parties seek the same exact relief. *See Chabad of S. Ohio v. Cincinnati*, 363 F.3d 427, 432 n.1 (6th Cir. 2004) ("in a facial challenge such as this where one party has standing, we need not consider the issue of the standing of other parties to the action").

[4] *Accord State Nat. Bank of Big Spring*, 795 F.3d at 53 (Kavanaugh, J.) (holding that a plaintiff "has standing" to challenge the authority to "impos[e] disclosure requirements"); *Aid for Women v. Foulston*, 441 F.3d 1101, 1110 (10th Cir. 2006) (holding that plaintiffs have standing because "they are among those covered by the reporting statute"); *Green v. Raleigh*, 523 F.3d 293, 299 (4th Cir. 2008) (similar); *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012) ("[T]he [plaintiff] has Article III standing to challenge the constitutionality of [the] disclosure law" because there is a "sufficiently realistic possibility that [it] would be subject to [the] registration and reporting

The government has yet to find a case that says otherwise. Of the 19 cases it cites, Mem.7-19, five never mention standing and the government cites their merits propositions as if they were standing propositions.[5] Ten involved no reporting mandate at all.[6] Three held that the plaintiffs did have standing.[7] And one held that the plaintiffs lacked standing to challenge a reporting requirement precisely because they were *not* "subject to the … reporting requirement." *Crawford*, 868 F.3d at 458. The opposite, of course, is true here. Am.Compl. ¶¶136-38, 140, 141, 150, 151, 160-62, 164, 171-73.

The plaintiffs are all objects of the reporting mandate because it will require their transactions to be reported. All four plaintiffs "will be a direct object of the amended §6050I." Am.Compl. ¶¶141, 151, 164, 173. They "will engage in the type of $10,000 digital asset transactions that will necessitate that other parties or he report the transactions to the government." Am.Compl. ¶¶140, 151, 162, 172. They will receive and pay cryptocurrency payments in a wide range of covered transactions "over $10,000." Am.Compl. ¶¶136-38, 150, 160-61, 171. They therefore "will have to reveal [their] receipt and sending of cryptocurrency and [their] personal identifying information." ¶¶140, 149, 151, 167-68, 94-104; *see also* ¶¶147, 156, 170, 176.

The government responds that although the plaintiffs are direct objects of the reporting mandate, that fact does not confer standing because the plaintiffs lack a "legally protected" interest in

---

requirements."); *Nat. Org. for Marriage v. McKee*, 649 F.3d 34, 49-50 (1st Cir. 2011), *abrogated on merits grounds by Bonta*, 141 S. Ct. 2373 (holding that plaintiff "has standing to challenge the … provision" because it would require it to "register and file reports").

[5] *United States v. Ritchie*, 15 F.3d 592 (6th Cir. 1994); *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987); *United States v. Bell*, 414 F.3d 474 (3d Cir. 2005); *In re PHE, Inc.*, 790 F. Supp. 1310 (W.D. Ky. 1992); *United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501 (2d Cir. 1991).

[6] *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016); *United States v. Windsor*, 570 U.S. 744 (2013); *Lujan*, 504 U.S. 555; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021); *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397 (6th Cir. 2018); *Kanuszewski v. Mich. HHS*, 927 F.3d 396 (6th Cir. 2019); *Caldwell v. Caldwell*, 545 F.3d 1126 (9th Cir. 2008); *Kowalski v. Tesmer*, 543 U.S. 125, 127 (2004); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

[7] *Parsons v. DOJ*, 801 F.3d 701; *Halbig v. Burwell*, 758 F.3d 390 (D.C. Cir. 2014); *Yellen*, 54 F.4th 325.

the reported information. *See* Mem.10. In support, it cites merits passages about "legally protected interests" as if they stood for standing propositions. *Id.* at 10, 13, 18. But as the Sixth Circuit has explained, that tactic doesn't work. The requirement that a plaintiff assert a "legally protected right or interest" to have standing "requires only that the plaintiff show she 'has a right to relief *if the court accepts the plaintiff's interpretation* of the constitutional or statutory laws.'" *Gerber v. Herskovitz*, 14 F.4th 500, 507 (6th Cir. 2021) (emphasis added). It does not "creat[e] an independent fourth requirement to establish standing." *Id.* "If that were the test, every losing claim would be dismissed for want of standing." *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 390 (6th Cir. 2022). Since the plaintiffs are indisputably direct objects of the reporting mandate, *see* Mem.37, which *they* interpret the Constitution to forbid, they have satisfied Article III.

The Court could stop there; but if more were needed, the plaintiffs have plausibly alleged other bases for standing as well. Namely, the reporting mandate harms them by imposing compliance costs, disclosing their private information, imposing economic harm, changing their desired behavior, and threatening them with penalties.

**Compliance Costs**. "Compliance costs are a recognized harm for purposes of Article III." *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022). A plaintiff has standing "when a statute 'imposes costly, self-executing compliance burdens.'" *Magaw*, 132 F.3d at 279; *accord Lac Vieux Desert Band v. Mich. Gaming Control Bd.*, 172 F.3d 397, 406 (6th Cir. 1999). Even if a challenged law "does not cause injury by itself," its requirements can still "cause compliance costs for the plaintiff, a classic injury-in-fact." *City of Kennett v. EPA*, 887 F.3d 424, 431 (8th Cir. 2018) (cleaned up). Though the government seems to think otherwise, *see* Mem. 11-12, 19, there is no "de minimis" exception to compliance-cost standing. *See Yellen*, 54 F.4th at 342-43 ("even a small amount of money"); *McGowan v. Maryland*, 366 U.S. 420, 430-431 (1961) (five-dollar loss); *Truesdell v. Friedlander*, 2020 WL 5111206, at *3-4 (E.D. Ky. Aug. 31) ("modicum").

13

Here, the reporting mandate will "inflict compliance costs" on all four plaintiffs. Am.Compl. ¶¶145, 154, 165, 174. They will devote "time, effort, and resources to completing §6050I reports," ¶145, which each take "hours or days to finalize," ¶¶154, 165. They will "be compelled to implement and execute processes for tracking" potentially qualifying transactions, including transactions that might later be "related" to other transactions to qualify for reporting. ¶¶145, 154, 165, 174. They will be forced to pay tax accountants "thousands of dollars" to ensure "compliance with" the mandate. ¶¶145, 154, 166. The plaintiffs must begin incurring these compliance costs now. ¶¶145, 147, 154, 156, 165, 170, 174, 176, 179. And though "even a small amount" of time or money would satisfy Article III, *Yellen*, 54 F.4th at 342-43, the plaintiffs' injuries here are greater than de minimis. *Compare* Am.Compl. ¶¶145, 154, 165, 174 ("thousands of dollars" plus "hours" or "days" per report) *with Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 233 (2014) (de minimis means "a few seconds or minutes of work"); *Citadel Sec. LLC v. SEC*, 45 F.4th 27, 37 (D.C. Cir. 2022) (de minimis means "350 microseconds").

The government makes two of its own allegations about the plaintiffs' compliance-cost injuries. It alleges that the plaintiffs were already "in full possession of the information required to be reported" before the mandate, Mem.12; *see also* Mem.17 (similar), and that the plaintiffs' costs are based on undue "speculati[on]," Mem.12. In addition to being improper at the motion-to-dismiss stage, *Mediacom Southeast LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 399 (6th Cir. 2012); *Winget v. JP Morgan Chase Bank*, N.A., 537 F.3d 565, 575 (6th Cir. 2008), both of those allegations are false. The plaintiffs are not in full possession of the information required to be reported. *See* Am.Compl. ¶¶145, 147, 154, 156, 165, 170, 174, 176. And their compliance costs are based on sound judgment. Am.Compl. ¶¶18, 26, 38, 116, 145, 154, 165, 180, 181.

**Information Disclosure**. Even when not a direct object of a reporting mandate, a "plaintiff's allegation that the defendant improperly collected [his] information" alone "alleg[es] an injury." *Klimas*

*v. Comcast Cable Commc'ns*, 465 F.3d 271, 275 (6th Cir. 2006). The government scoffs at the idea that a plaintiff's "intangible, psychic harm in being forced to share reports of his business activities" constitutes an injury. Mem.17. But binding precedent says it does. *See Davis*, 554 U.S. at 733 (plaintiff has "standing to challenge [a] disclosure requirement[t]" that will "force" the "disclos[ure]" of his personal information); *Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 118-21 (6th Cir. 2017) (plaintiff "ha[s] standing" if defendant shared plaintiff's "name, address, and magazine choice" without plaintiff's consent); *Kanuszewski v. Mich. HHS*, 927 F.3d 396, 410 (6th Cir. 2019) (plaintiff has standing to challenge government action that will "invad[e]" his alleged "privacy interests" by review of information *already collected*); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("intangible injuries can nevertheless be concrete") (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009)).

Here, the reporting mandate will force the plaintiffs to disclose their names, addresses, Social Security numbers, and transactional details to the government and others. Am.Compl. ¶¶19, 114, 140, 143, 144, 146, 151, 162, 167. The reporting mandate will also allow the government to invade their privacy interests by reviewing and analyzing the personal data that it collects. ¶¶106-114. That data will spread. ¶¶120-21. Because the plaintiffs allege that this information is unconstitutionally collected, they have standing. *Klimas*, 465 F.3d at 275. The government misreads the Sixth Circuit's decision in *Crawford*, 868 F.3d 438, to reject an information-disclosure injury. Mem.18. In *Crawford* no Plaintiff "claim[ed] to … be subject to the individual-reporting requirement." *Id.* at 458. The plaintiffs whose accounts would be reported if they exceeded $50,000 alleged only "$10,000," and those whose accounts would be reported if they exceeded $200,000 alleged only "$75,000." *Id.* The plaintiffs here supply the missing link from *Crawford*—they *have* and *will* exceed the mandate's threshold of $10,000 and thus be "subject to [its] requirements" *Id.*; *e.g.* Am.Compl. ¶136 ("*over* $10,000") (emphasis added); ¶¶138, 140, 149-51, 161-62, 171 (same).

**Economic harm.** "[A]ny ... petitioner who is likely to suffer economic injury as a result of [a challenged action] that changes market conditions satisfies [the] standing test." *Clinton v. City of New York*, 524 U.S. 417, 433 (1998). "An economic injury which is traceable to the challenged action satisfies the requirements of Article III." *Linton ex rel. Arnold v. Comm'r of Health & Env't*, 973 F.2d 1311, 1316 (6th Cir. 1992). It is well-established that "indirect economic harm resulting from governmental action can constitute injury in fact." *Dominion Nat. Bank v. Olsen*, 771 F.2d 108, 113-14 (6th Cir. 1985); *see also GMC v. Tracy*, 519 U.S. 278, 286 (1997) (tax on gas producers injured car company because of likely price increase); *Huish Detergents, Inc. v. Warren Cty.*, 214 F.3d 707, 710 (6th Cir. 2000) (garbage-disposal contract injured laundromat because of likely price increase).

The reporting mandate will cause the plaintiffs economic harm. It "will make businesses more reluctant to use Bitcoin, which will hurt Mr. Carman's business" of helping customers use Bitcoin. Am.Compl. ¶142; *see also* ¶¶106-28 (explaining why). It will cause Coin Center's donors to "be less likely to donate out of fear that their unrelated donor activity would be revealed to the government and to other parties." ¶153. And it will similarly cause an "uncertain and compromised business environment" for Quiet Industries, causing it to "likely lose business." ¶175.[8]

**Changed Behavior.** "[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge … the constitutionality of a law." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). Plaintiffs have standing if they "allege in a precise manner that, but for the sanctions of the … provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision." *Lac Vieux Desert Band*, 172 F.3d at 406. For instance, plaintiffs can allege that they "want to continue [activities]

---

[8] The government's "traceability" objection to this injury, Mem.13, has been rejected over and over. *See Parsons*, 801 F.3d at 713-14 ("[T]he allegation that a defendant's conduct [will be] a motivating factor in the third party's injurious actions satisfies the [traceability] standard."); *Commerce*, 139 S. Ct. at 2565-66 (similar).

specifically prohibited by … the Act" and that, "were the Act to be declared unconstitutional, they would promptly resume the prohibited activities." *Magaw*, 132 F.3d at 282.

Here, the reporting mandate imposes legal liabilities that will cause the plaintiffs to change their behavior. They will "refrain from some … uses of cryptocurrency that [they] would otherwise engage in because those uses would implicate burdensome requirements and intrusions on [their] privacy," Am.Compl. ¶169, and be "less likely to make contributions to advocacy and religious organizations and engage in other expressive activities," ¶146. Because the mandate reveals old transactions, "it is chilling the plaintiffs' activities now." ¶182. The government says that these changes in behavior rely on a speculative "compound hypothetical," foreclosed by *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013). Mem.14. But that response falls short for two reasons. *Clapper*'s searching scrutiny does not apply at the motion-to-dismiss stage. *See Parsons*, 801 F.3d at 715 ("*Clapper* was dismissed for lack of standing at the summary judgment stage," so the "burden on the plaintiffs was therefore significantly higher."). And there is nothing unduly speculative about saying that the burdens are worth avoiding or that the government will be able to connect their transactions. Am.Compl. ¶¶106-23.[9]

**Enforcement.** A plaintiff also has standing based on the prospect that a law will be enforced against him if he alleges: "(1) an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) "that this course of conduct was arguably proscribed by the [challenged law]," and (3) "that if [he] should pursue such a course of conduct, there was a credible threat that [the defendant] would pursue [an enforcement] action." *Yellen*, 54 F.4th at 336. The plaintiffs satisfy

---

[9] The government also counter-alleges that (1) the plaintiffs will *not* change their behavior because their information was already public, (2) the plaintiffs' refrained-from activities would *not* be subject to §6050I, and (3) the plaintiffs' refrained-from activities would *not* lead to a "specific future harm." Mem.14-16. But the government is again venturing outside the complaint. The complaint alleges the opposite on each point, and those factual allegations must be accepted as true. Am.Compl. ¶¶44-69, 105-23, 136-38, 140, 141, 144, 146, 150-51, 160-62, 164, 167, 171-73, 178. *See also Parsons*, 801 F.3d at 706 ("When considering whether pleadings make out a justiciable case for want of standing, our analysis must be confined to the four corners of the complaint.").

this test. They regularly receive cryptocurrency in transactions—including mining and anonymous donations—in which it's not feasible to identify a sender. Am.Compl. ¶¶32-33, 137, 152, 155, 160, 171, 244; 26 U.S.C. §6050I(b)(2)(A). But the plaintiffs will face steep penalties if they fail to provide the sender's information. 26 U.S.C. §§7203, 6050I(f)(1), 6721, 6722. Because doing so will not be feasible and nothing in the statute excuses the reporting mandate in this situation, it is "a plausible interpretation of the statute" that they will face an enforcement action. The government "intend[s] to enforce" the reporting mandate, *Yellen*, 54 F.4th at 337, and has "refused to disavow enforcement" against the plaintiffs, *Fischer v. Thomas*, 52 F.4th 303, 309 (6th Cir. 2022); *see* Mem.17. While the government half-heartedly says that the executive branch might later *choose* to ignore the reporting mandate in this scenario, Mem.17, that argument would defeat standing in every pre-enforcement challenge to a statute. Courts "would not uphold an unconstitutional statute," let alone deny a plaintiff standing to challenge it, "merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010). And to top it all off, the government's "actions in related circumstances," *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018), include having already taken action against Mr. Carman's law practice under the cash-only §6050I. Am.Compl. ¶179.

The plaintiffs are here because the amended §6050I will upend their lives and livelihoods. Their complaint alleges more than enough to give them standing to challenge it.

**B.  The plaintiffs' claims are ripe.**

The government argues that the plaintiffs' claims are not ripe because they are not "fi[t] … for judicial decision." *Abbott Lab's v. Gardner*, 387 U.S. 136, 149 (1967); Mem.19-20.[10] A claim is not

---

[10]  Ripeness depends on two factors: Whether the claim is "fi[t] … for judicial decision" and whether there will be "hardship to the parties" in withholding a decision. *Abbott Lab's.*, 387 U.S. at 149. The government argues only the first factor. Mem.19 n.5. The second factor is easily met based on the consequences that the reporting mandate is imposing on the plaintiffs now. *See* Am.Compl. ¶¶18, 38, 116, 145, 154, 165, 180, 182.

fit for judicial decision only "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014). "[I]f a defendant's 'ripeness arguments concern only' the 'requirement that the injury be imminent' … then 'it follows that our analysis of [the] standing challenge applies equally and interchangeably to [the] ripeness challenge.'" *Thomas More L. Ctr. v. Obama*, 651 F.3d 529, 537-38 (6th Cir. 2011), *abrogated on merits grounds by NFIB*, 567 U.S. 519; *accord Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 81 (1978); *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975).

Claims are fit for judicial decision long before a challenged law goes into effect. "'[F]acial' challenges to [laws] are generally ripe the moment the challenged [law] is passed." *Suitum v. Tahoe Reg. Planning Agency,* 520 U.S. 725, 736 n.10 (1997). When plaintiffs bring facial challenges to congressional statutes, "[t]he [Supreme] Court has allowed challenges to go forward even though the complaints were filed almost six years and roughly three years before the laws went into effect." *Thomas More*, 651 F.3d at 537. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974). "[N]o function of standing law is advanced by requiring plaintiffs to wait until six months or one year before the effective date to file [a] lawsuit." *Thomas More*, 651 F.3d at 537.

The plaintiffs' claims here are all ripe. They are all facial constitutional challenges. And the reporting mandate has already been enacted, will go into effect in less than a year, is part of a statute that the government has already been enforcing for decades, applies to transactions happening now, injures the plaintiffs now, and does not depend on any implementing regulations. *See* Am.Compl. ¶¶18, 36, 38, 116, 145, 154, 165, 179-82. "There is no reason to think that plaintiffs' situation will change. And there is no reason to think the law will change." *Thomas More*, 651 F.3d at 537. The government's more claim-specific ripeness arguments do not move the needle either.

**First Amendment**. The government argues that the only kind of injury that is ripe under the First Amendment is a "threat of prosecution." Mem.20. But the plaintiffs alleged that here. *See supra* I.A.6. And the government misstates the law. *See, e.g.*, 13B Wright & Miller §3532.2 (3d ed. 2022) (for ripeness, "it is enough … that the plaintiff is presently conforming to its requirements, or must arrange its affairs to conform"). The government identifies no awaited facts that will change the First Amendment claim. *Kiser*, 765 F.3d at 606.

**Fourth Amendment**. The government notes that Fourth Amendment claims "typically" require "case-by-case" adjudications, Mem.20, but that's because most Fourth Amendment cases are post-hoc and fact-specific. Not so with pre-enforcement challenges to "*statutes* authorizing warrantless searches." *Patel*, 576 U.S. at 416 (emphasis added). The facial constitutionality of those statutes doesn't turn on particularized facts. And "facial challenges under the Fourth Amendment are not categorically barred or especially disfavored." *Id.* at 415-16 (collecting cases).

**Fifth Amendment**. The government argues that the Fifth Amendment claim is unripe because vagueness challenges cannot be brought unless a statute is "impermissibly vague in all its applications." Mem.20. But that argument could be made of all facial challenges, even though facial challenges are quintessentially ripe. *See Hill v. Snyder*, 878 F.3d 193, 214 (6th Cir. 2017). And it misstates the law for facial vagueness challenges. The Supreme Court has "squarely" rejected "the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015).

**Article I**. The government argues that the plaintiffs' remaining claims are not ripe because they are wrong on the merits. Mem.21. Its one cited case doesn't even mention ripeness. *Id.* (citing *United States v. Sullivan*, 274 U.S. 259 (1927)). But like standing, ripeness cannot be conflated with the merits. *Cf. CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 489 (6th Cir. 2021) ("just because a plaintiff's

claim might fail on the merits does not deprive the plaintiff of standing to assert it"). All of the plaintiffs' claims are ripe.

## II.   The plaintiffs have alleged plausible claims.

The reporting mandate is the antithesis of limited government. Its burdens on users' expressive associations violate the First Amendment. Its warrantless intrusions into private and intimate affairs infringe the Fourth Amendment. Its metaphysically impossible demands make it unconstitutionally vague. And its lack of a foothold in Article I or the Sixteenth Amendment makes it beyond Congress's power. Accepting all facts alleged in the complaint as true, and drawing all plausible inferences in the plaintiffs' favor, *Parsons*, 801 F.3d at 710, the reporting mandate is unconstitutional.

### A.   The reporting mandate violates the First Amendment.

Under the First Amendment, the reporting mandate chills private association and thus triggers exacting scrutiny. The government does not dispute that standard, and the government cannot possibly meet its burden of overcoming that standard at the motion-to-dismiss stage.

#### 1.   The reporting mandate triggers exacting scrutiny.

"Exacting scrutiny is triggered by 'state action which *may* have the effect of curtailing the freedom to associate'" or "by the 'possible deterrent effect' of disclosure." *Bonta*, 141 S. Ct. at 2388 (emphasis in original). The "compelled disclosure" of associations is one such action. *Id.* at 2382. In *Bonta*, for example, a law that made organizations report the receipt of payments above $5,000 triggered exacting scrutiny. *Id.* at 2380, 2385. So too here. As the dissent observed, after *Bonta* "disclosure regimes must *always* be narrowly tailored," "[r]egardless of whether there is any risk of public disclosure, and no matter if the burdens on associational rights are slight, heavy, or nonexistent." *Id.* at 2398 (Sotomayor, J., dissenting) (emphasis added). The government doesn't disagree, as it spends its First Amendment section arguing only that the mandate "*withstands* exacting scrutiny." Mem.32 (emphasis added).

Here, the reporting mandate triggers exacting scrutiny because it compels disclosure of protected associations in three independent ways. First, it exposes the expressive associations of the parties to covered transactions. When someone reports a single transaction, whatever that transaction involves, he must report enough information to reveal his pseudonymous address on the public ledger. From that, the government can see his unrelated, expressive associations. Am.Compl. ¶¶44-69, 105-125, 230; Nakamoto, *supra*, at 6. From one report about a commercial transaction, the government can see which religious groups and political causes a person associated with years earlier. *Id.* Second, the reporting mandate exposes expressive associations because it forces other parties to collect and store and distribute the same sensitive information, allowing them to see the same previously-unknown, expressive associations. Am.Compl. ¶¶121, 146, 231; §6050I(e); 31 C.F.R. §1.6050I-1(e)(3)(iii). And third, the reporting mandate requires the direct reporting of expressive activities. Although the mandate applies only to receipts in the course of a "trade or business," that term encompasses a wide range of protected activities and associations. Am.Compl. ¶¶32-33, 232. In these three compounding ways, the reporting mandate will reveal to the government an unprecedented level of detail about cryptocurrency users' expressive associations, thus chilling them.[11]

The government does not dispute that the reporting mandate triggers exacting scrutiny, except in one sentence incorporating by reference its standing argument that there is no "legally protectable interest" in business associations. Mem.32 (referencing Mem.13-15). The First Amendment's

---

[11] The plaintiffs explained in their complaint why nonprofits must, do, and will submit §6050I reports. Am.Compl. ¶¶32-33, 152. The government's response is that "donative intent when someone sends digital assets to advocacy and religious organizations *may* take the transfer out of the statute." Mem.14 (emphasis added). The government's equivocal shoulder-shrug—about whether nonprofits must make their donors' identities shareable with law enforcement worldwide—itself shows that expressive associations will be chilled. *See Bates v. State Bar of Arizona*, 433 U.S. 350, 380 (1977) ("First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the in terrorem effect of the statute.").

protections are not so limited.[12] But regardless, the government concedes that the First Amendment

protects associations involving "intimate or private relationships" or "for the purpose of engaging in

… speech, assembly, petition for the redress of grievances, and the exercise of religion." Mem.13. And

the plaintiffs here allege that the mandate exposes exactly those kinds of heartland associations.

Am.Compl. ¶¶32-33, 44-69, 105-125, 146, 230-32. That alone suffices. Because the reporting mandate

compels disclosure of every user's First-Amendment-protected associations, it triggers exacting

scrutiny.

**2. The reporting mandate cannot overcome exacting scrutiny.**

The government cannot overcome exacting scrutiny for two reasons. First, any argument that

it could would be academic at the motion-to-dismiss stage. Once exacting scrutiny is triggered, the

government bears the burden to "demonstrate its need for universal production in light of any less

intrusive alternatives." *Bonta*, 141 S. Ct. at 2386 (emphasis added); *see also Thomas v. Bright*, 937 F.3d

721, 734 (6th Cir. 2019) ("'the Government carries the burden'"), *abrogated on other grounds by City of*

*Austin v. Reagan Nat'l Advertising*, 142 S. Ct. 1464 (2022). The government "must affirmatively establish

the reasonable fit." *Bonta*, 141 S. Ct. at 2387. At the motion-to-dismiss stage, where the Court is

confined to the four corners of the complaint and cannot weigh the evidence, the government cannot

carry its burden. *See Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 399 (6th Cir.

2012) ("A district court is not permitted to consider matters beyond the complaint. To do so would

convert the motion to dismiss into a motion for summary judgment.") (internal citations omitted); *see*

---

[12] *E.g.*, *East Brooks Books, Inc. v. City of Memphis*, 48 F.3d 220, 226 (6th Cir. 1995) (forced disclosure of the personal information of those who hold interests or accounts in disfavored businesses); *In re First National Bank*, 701 F.2d 115, 116 (10th Cir. 1983) (same); *United States v. Citizens State Bank*, 612 F.2d 1091, 1093 (8th Cir. 1980) (forced disclosure of financial records that would "identify the members of and contributors to [an organization]"); *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 453 (1958) (forced disclosure of membership and contributor lists); *Baldwin v. Comm'r*, 648 F.2d 483, 485-87 (8th Cir. 1981) (same); *Familias Unidas v. Briscoe*, 619 F.2d 391, 402 (5th Cir. 1980) (same); *see also Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000).

23

*also Yellowbear v. Lampert*, 741 F.3d 48, 59 (10th Cir. 2014) (Gorsuch, J.) (denying summary judgment to government because the "compelling interest test" in "First Amendment cases" "isn't traditionally the sort of thing that can be satisfied by the government's bare say-so").

The prematurity of the government's exacting-scrutiny argument is especially evident here. The plaintiffs allege facts about the means chosen by the government that, if true, establish that the reporting mandate is not narrowly tailored to a sufficiently compelling government interest. Am.Compl. ¶¶105-25, 236-27. And the government's own exacting-scrutiny argument relies on contested claims—like the assertion that, to track "difficult-to-detect income," the government needs to force taxpayers to report payments that are not income. Mem.33. Even if the government could eventually "demonstrate" that it overcomes exacting scrutiny, *Bonta*, 141 S. Ct. at 2386, it would have to do so at summary judgment, *Mediacom*, 672 F.3d at 399; *see also Boustani v. Blackwell*, 460 F. Supp. 2d 822, 826 (N.D. Ohio 2006) ("The State is obliged to adduce proof of its actual, compelling governmental interest").

Second, even assuming that the government could overcome exacting scrutiny in a motion to dismiss, the plaintiffs have plausibly alleged that the reporting mandate fails it. Exacting scrutiny requires that the reporting mandate serve a "sufficiently important" or "compelling" government interest and be "narrowly tailored" to that interest, *Bonta*, 141 S. Ct. at 2384 (controlling op. of Roberts, C.J.). "Narrow tailoring" requires that the government show more than a "substantial relation" between the mandate and the interests that it advances. *Id.* It "must instead demonstrate its *need* for universal production in light of *any* less intrusive alternatives." *Id.* at 2386 (emphases added).[13]

---

[13] The government quotes *Bonta* as saying that a law is narrowly tailored if its interests "cannot be served equally well in significantly less burdensome ways." Mem.32 (quoting *Bonta*, 141 S. Ct. at 2383). But that quote does not appear in *Bonta*. The *Bonta* standard, quoted above, is harder for the government to meet.

*Bonta* illustrates how exacting scrutiny works. The reporting mandate at issue in *Bonta* required charities to report the names and addresses of donors who paid them over $5,000. 131 S. Ct. at 2380. As to the "government interest," the Court agreed—in light of the government's trial evidence—that the government established a sufficiently compelling interest in "preventing wrongdoing" and "fraud" by "charitable organizations." *Id.* at 2385-86. But as to "narrow tailoring," the Court held that the government's evidence at trial did not establish narrow tailoring, so the reporting mandate "fail[ed] exacting scrutiny." *Id.* at 2389. Although the government argued and testified about why it could not achieve the same fraud-policing ends through alternatives—such as subpoenas and audit letters—the trial evidence showed that in practice the government "had not even considered alternatives to the current disclosure requirement." *Id.* at 2386. Although the government said that alternatives would risk tipping off would-be fraudsters, "the [government's] witnesses failed to substantiate that concern." *Id.* Importantly, "even if tipoff were a concern in some cases, the [government's] indiscriminate collection of [reports] in all cases would not be justified." *Id.* at 2387. And though the government said it needed the reports to police charitable fraud, the reports were imposed on tens of thousands of organizations, so the government needed to provide evidence that the reports "form an integral part of [its] fraud detection efforts." *Id.* at 2386. That "mismatch" between the scope of mandate and its use by the government meant that it failed exacting scrutiny. *Id.* There is no need to "cast a dragnet" for "sensitive" information that will not be used in most cases. *Id.* Therefore, the reporting mandate was not narrowly tailored.

The reporting mandate here will fail exacting scrutiny too. As to a compelling government interest, the government says that the mandate helps "ensur[e] compliance with income tax reporting requirements." Mem.32. That claim is immediately belied by the fact that mandated reports are *not* limited to tax enforcement, but instead are—unlike other tax reports—freely shareable with law enforcement. *See* 26 U.S.C. §6103(l)(15) ("[d]isclosure of returns and return information *for purposes*

*other than tax administration*" (emphasis added)). In any case, the interest in "ensuring compliance with income tax reporting" sounds more like the interest in "ease of administration" that the *Bonta* Court condemned than like the interest in preventing serious crimes that the *Bonta* Court said would suffice. 141 S.Ct. at 2387. The one case that the government cites in support of its position, Mem.33, was about the government's interest in not allowing people to opt-out from taxes that fund foreign wars. *Collett v. United States*, 781 F.2d 53, 55 (6th Cir. 1985). And that interest was sufficient only to overcome lower scrutiny. *Id.*

As to narrow tailoring, the reporting mandate is not narrowly tailored to the government's only asserted interest—in "ensur[ing] compliance with income tax reporting requirements." There are "alternatives" to the reporting mandate that are "less intrusive" in First Amendment terms, *Bonta*, 141 S. Ct. at 2386, and are not "need[ed]" to "ensur[e] compliance with income tax reporting requirements," Mem.32. Consider four:

- **Subpoenas and audit letters.** The government could use more particularized efforts, such as "subpoena[s] or audit letter[s]," to monitor compliance. *See Bonta*, 141 S.Ct. at 2386. *Bonta* categorically bars the government from overcoming exacting scrutiny without presenting evidence that it "considered" subpoenas and audit letters. *Id.*

- **Use of reports for non-tax purposes.** The government could make §6050I reports "less intrusive" by making them not shareable for non-tax purposes with local, state, and foreign law enforcement agencies. *See* 26 U.S.C. §§6103(l)(15) (making §6050I reports alone shareable); *Bonta*, 141 S. Ct. at 2389 ("each" new disclosure "brings with it an additional risk of [First Amendment] chill"). The government does not "need" to make these reports shareable to advance its only claimed interest—in ensuring income-tax reporting compliance—because local, state, and foreign law enforcement agencies do not enforce the federal income tax. Mem.32.

- **Transaction dates.** The government could allow users to omit the dates of their reported transactions. *See* 26 U.S.C. §6050I(b) (requiring "date" of transaction). This is a "less intrusive alternative," *Bonta*, 141 S. Ct. at 2386 because omitting the date would make it much more difficult to use the report to identify a user's address—and past expressive associations—on the public ledger. Am.Compl. ¶¶58-60, 69. The government cannot "demonstrate its need" for the date because its own conduct shows that it doesn't need it. Most tax forms traditionally do not ask for the exact date of transaction. *E.g.*, IRS Form 1099-MISC (requiring reporting of *aggregate* payments made during the tax *year*).

- **Nonprofits.** The mandate needlessly covers nonprofits by using the broad statutory term "trade or business." Am.Compl. ¶¶32-33. Nonprofits engage in a high number of sensitive transactions directly subject to the mandate. Am.Compl. ¶¶32-33. The government does not "need" to police their receipts to ensure income-tax reporting compliance because nonprofits are less likely to hide taxable income (most of their income isn't taxable). Holding otherwise would be difficult to reconcile with *Bonta*.

Instead of taking these more measured courses, the reporting mandate "casts a dragnet" for sensitive information from everyone who participates in high-value cryptocurrency transactions, "even though that information will become relevant in only a small number of cases." *Bonta*, 141 S. Ct. at 2387. Its "indiscriminate collection" of potentially millions of reports, to use in some small number of tax-compliance cases, is "not … justified." *Id.* The reporting mandate therefore will, at summary judgment, fail narrow tailoring under *Bonta*.[14]

The narrow-tailoring analysis is even easier here than in *Bonta*. The reporting mandate in *Bonta* required fewer details about the payment and required reports yearly rather than within 15 days of each transaction. 141 S. Ct. at 2180. The reporting mandate in *Bonta* was not enforced with felony criminal penalties, whereas the reporting mandate is. *Id.* at 2379-80. The reports in *Bonta* were supposed to (but did not always) remain confidential under the law, whereas the reports here can be shared freely with local, state, federal, and even *foreign* law-enforcement. *Id.* at 2387; 26 U.S.C. §6103(l)(15). The reporting mandate in *Bonta* applied to information that the subject organizations

---

[14] The government makes two narrow-tailoring arguments that ignore *Bonta*. First, it says that the reporting mandate is not "universal" because it is "limited only to (1) trades or businesses, and (2) receiving $10,000 or more in cash or cash equivalents or digital assets." Mem.33. But *Bonta* said that a reporting mandate *was* "universal"—and therefore not narrowly tailored—where it was limited to (1) California charities (2) receiving $5,000. 131 S. Ct. at 2380. A mandate is "universal" and likely to fail exacting scrutiny when it requires "up-front collection" of everything within its scope, as the reporting mandate does. *Id.* at 2386. Second, it says that subpoenas or audit letters directed at particular taxpayers would be ineffective—the government, it asserts, "cannot know whom to subpoena" without the reports. Mem.34. But the government made a similar argument in *Bonta*: that "alternative means of obtaining Schedule B information—such as a subpoena or audit letter—are inefficient and ineffective compared to up-front collection." 141 S.Ct. at 2386. The Court rejected that argument in the absence of "trial" evidence that the government had "considered alternatives." *Id.*

already collected and reported, whereas the reporting mandate here applies to information that the plaintiffs do not collect or report and may be impossible to collect or report. 141 S. Ct. at 2188. And of course, the narrow tailoring in *Bonta* was supported with evidence from two bench trials, not the government's bare say-so in a motion to dismiss. *Id.* at 2381. Both now and at summary judgment, the reporting mandate will not overcome exacting scrutiny.[15]

## B. The reporting mandate violates the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. "The 'basic purpose of this Amendment,' [the Supreme Court's] cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). "The Founding generation crafted the Fourth Amendment as a 'response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Id.*

The reporting mandate violates the Fourth Amendment because it is a "search" that is "unreasonable." *Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 371 (6th Cir. 1998). If police officers showed up at a person's house without reason to suspect him of wrongdoing, forced

---

[15] The government does not argue that the plaintiffs' First Amendment claim fails the test for a facial challenge. *See* Mem.20, 32-35. It has therefore forfeited that argument. *See, e.g.*, *Messer v. Jackson Cty.*, 2020 WL 5412480, at *3 (E.D. Ky. Sept. 9) (Caldwell, J.) ("the Court cannot consider those arguments because they were not raised in the motion to dismiss"). Its forfeiture makes sense. A First Amendment facial challenge requires only that "a substantial number of [the reporting mandate's] applications are unconstitutional, judged in relation to its plainly legitimate sweep." *Bonta*, 141 S. Ct. at 2387. The reporting mandate has no "plainly legitimate sweep" because all of its applications give the government access to the parties' unrelated expressive transactions. And in any event, a substantial number of its applications implicate expressive associations. *E.g.*, Am.Compl. ¶¶13, 19, 76, 121, 124-25. Notably, the *Bonta* plaintiffs won their facial challenge even though, among other things, many people subject to that reporting mandate "might even prefer … the disclosure of their identities to the State." 141 S. Ct. at 2388-90.

him to compile and produce detailed records of his transactions that would give them enough information to identify his unrelated private, expressive, and intimate affairs, and then made those records available to law-enforcement agencies worldwide, surely it would violate the Fourth Amendment. The government's position in this case is that it can multiply this Fourth Amendment violation against every cryptocurrency user in America, add a felony punishment for non-compliance, and yet escape liability. That backwards position has no basis in law or logic.

1.   **The reporting mandate is a search.**

The reporting mandate effects a search because it encroaches on the reasonable expectations of privacy of parties to reported transactions. A "search" occurs even when the government requires the *subjects* to do it themselves—as opposed to physical entry carried out by government agents. *See Hale v. Henkel*, 201 U.S. 43, 76 (1906); *e.g.*, *Chandler v. Miller*, 520 U.S. 305, 313 (1997) (Fourth Amendment right against laws requiring people to unilaterally furnish evidence to the government); *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472 (S.D.N.Y. 2019) (Fourth Amendment right against laws requiring people to report their business transactions to the government). The government conducts a "search" when it encroaches on a "reasonable expectation of privacy." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). A government action encroaches on a "reasonable expectation of privacy" whenever someone "seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* (cleaned up). To decide "which expectations of privacy are entitled to protection," the Supreme Court asks whether recognizing such a protection will serve to "secure the privacies of life against arbitrary power" and "place obstacles in the way of a too permeating police surveillance." *Id.* at 2213-14. Importantly, "[a]s technology … enhance[s] the Government's capacity to encroach upon areas normally guarded from inquisitive eyes, th[e] Court has sought to 'assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id.* at 2214.

29

For a host of overlapping reasons, Americans have a reasonable expectation of privacy in the personal transactional histories that the reporting mandate reveals. An individual has a reasonable expectation of privacy in "his or her personal affairs." *United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001). "[O]f course, it is long settled that the Fourth Amendment's protection of 'papers' covers business records." *Airbnb*, 373 F. Supp. 3d at 483 (collecting cases); *see also, e.g., City of Los Angeles v. Patel*, 576 U.S. 409 (hotel check-in records). The Fourth Amendment's protections are even stronger when the government seeks records that would reveal private and personal information. A person's "familial, political, professional, religious, and sexual associations" are the quintessential "privacies of life" entitled to protection. *Carpenter*, 138 S. Ct. at 2217. And the Fourth Amendment's protections are stronger yet when the search reveals not just isolated bits of information, but a large "quantity" of information. *Riley v. California*, 573 U.S. 373, 395 (2014).

The reporting mandate encroaches on all these realms. It compels people to report detailed information about their personal transactions and associations. Am.Compl. ¶¶94-103. The reports then include enough information for the government to identify their addresses on the public ledger to see their unrelated associations. Am.Compl. ¶¶44-69, 105-125. From a single report, the government can access a large "quantity" of "data"—a comprehensive transaction history—that can "date back" to many "years" earlier. *Riley*, 573 U.S. at 394. The government can learn about the person's "intimate" activities, *Kyllo v. United States*, 533 U.S. 27, 37 (2001), whom their customers are, *Patel*, 576 U.S. 409, whether their purchases suggest "symptoms of disease," *Riley*, 573 U.S. at 395, or whether they have "alcohol, drug, and gambling addictions," *id.* at 396. It can learn whether they are supporting their grown children, what religious organizations they tithe to, what they are reading, or whom they are dating. *E.g.* Am.Compl. ¶¶139, 143. These "privacies of life" are comfortably protected under the Fourth Amendment. *Carpenter*, 138 S. Ct. at 2217. To give the government free access to them would certainly not "assure preservation of that degree of privacy against government that

30

existed when the Fourth Amendment was adopted." *Carpenter*, 138 S. Ct. at 2214. Therefore, the reporting mandate is a "search."

The government raises three arguments that the reporting mandate is not a search. First, it says that cryptocurrency users do not have an "actual, subjective expectation of privacy" in the information revealed by the reporting mandate. But if users of cryptocurrency don't have a subjective expectation of privacy in pseudonymous personal transaction histories, including detailed information about their donors and associates, then it's hard to imagine who would ever have such an expectation. Cryptocurrency users follow the state-of-the art protocol for privacy in transactions. Am.Compl. ¶¶52-69; *see also* Nakamoto, *supra*, at 6 (describing "new privacy model"). They take affirmative steps to preserve their privacy—including not publishing their names and addresses alongside each other. Am.Compl. ¶¶82-84, 58-59, 178. *See United States v. Chadwick*, 433 U.S. 1, 11 (1977) (noting enhanced expectation where a person "shuts the door" to a phone booth or "plac[es] his personal effects inside a double-locked footlocker"), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). The Sixth Circuit and Supreme Court have held that people have a "subjective expectation of privacy" in things that are kept much less private. *E.g.*, *United States v. Warshak*, 631 F.3d 266, 284 (6th Cir. 2010) (emails about "business and personal life" sent to others and shared with commercial internet-service provider); *Riley*, 573 U.S. at 395 (cell phone purchases, apps, communications); *Carpenter*, 138 S. Ct. 2206 (whereabouts on public streets); *Patel*, 576 U.S. 409 (hotel check-ins).

Second, the government says that if the reporting mandate is unconstitutional, then so too must be many other tax forms, including the pre-amendment §6050I. Mem.25-27. But the amended §6050I is sui generis. Under the cash-only §6050I, reporting single *cash* transactions does not give the government any access to a person's past and future cash transactions. *Cf.* Am.Compl. ¶¶106-14, 124. The government cannot see, from a single §6050I report about a large cash transaction in 2024, that the receiver once gave a twenty-dollar bill to a friend ten years earlier. That's not how cash works. *Id.*

But it's precisely how cryptocurrency works.[16] The government's comparisons to other tax-reporting requirements are further afield. Those reporting requirements do not raise the same Fourth Amendment flags as the reporting mandate because, among other things, they are not shared freely with foreign, local, state, and federal law enforcement. *Compare* 26 U.S.C. §6103(l)(15), *with* 26 U.S.C. §6103(a). They require far less intensive reporting (or none at all). *Compare* 26 U.S.C. §6050I, *with* 26 U.S.C. §6001. They do not impose felony punishment for non-compliance. *Compare* 26 U.S.C. §7203 (all reporting violations are misdemeanors…), *with* 26 U.S.C. §7203 (…except for §6050I). And they do not give the government enough information to access unrelated transactions. *Compare* 26 U.S.C. §6050I, *with* 26 U.S.C. §6041.

Third and finally, the government says that parties to reportable transactions have forfeited their reasonable expectations of privacy. These parties, the government says, have already shared their personal transactional histories, or the information sufficient to access them, with "third part[ies]." Mem.23-29. Therefore, the government says, the "third-party" exception to Fourth Amendment search doctrine saves the reporting mandate. *Id.*

Yet cryptocurrency users definitely do *not* share their personal transactional histories—or the information sufficient to access them—with third parties. Cryptocurrency users "do *not* otherwise disclose the personal information of the parties to all of their transactions to the public." Am.Compl. ¶178. "Although a cryptocurrency public ledger is visible to anyone, it does not include the personal

---

[16] The government's equivalence of cryptocurrency and cash reporting is also hard to square with the Supreme Court and the Sixth Circuit's repeated admonition that "[w]hen confronting new concerns wrought by digital technology," *Carpenter*, 138 S. Ct. at 2222, courts must strive to "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted," *Kyllo*, 533 U.S. at 34; *see also Warshak*, 631 F.3d at 285 (explaining the "bedrock principl[e]" that that the Fourth Amendment will "wither and perish" if courts do not adjust protections to take account of "the inexorable march of technological progress"); *Riley*, 573 U.S. at 393-95 (holding that search-incident-to-arrest exception does not apply to cell phones because they reveal qualitatively and quantitatively more information than pre-cell-phone objects like wallets).

identifying information of the users." *Id.* "A cryptocurrency user does not need to share his personal identifying information, such as his name, address, and Social Security number, with anyone in order to use the technology." ¶55. "He does not need to provide it to a bank or similar middleman because the technology eliminates the need for such middlemen." *Id.* "He does not need to share his identifying information even with the parties with whom he transacts." *Id.* When a person's "transactions are posted to the public ledger," he can be "the only one who knows that those transactions are his." *Id.* Information that is known by zero other human beings cannot trigger the "third-party" exception, lest that exception swallow the Fourth Amendment.[17]

No case says that information falls within the third-party exception when that information is *not* shared. Even at the apex of the third-party exception, the Supreme Court said the opposite: A person cannot lose his reasonable expectation of privacy in information unless he "voluntarily convey[s]" the information to another party "in the ordinary course of business," and thereby "assume[s] the risk that the [other party] w[ill] reveal to police" that information. *Smith v. Maryland*, 442 U.S. 735, 744 (1979); *see id.* (challenger sent numbers dialed to phone company); *United States v. Miller*, 425 U.S. 435, 442-44 (1976) (challenger "voluntarily convey[ed]" financial information to a bank). Here, the reporting mandate does not ask for information already conveyed, as the plaintiffs' complaint thoroughly alleges. Am.Compl. ¶¶54-61, 106-08, 178. The mandate demands a person's own, unshared private information. 26 U.S.C. §6050I. This is not a third-party-doctrine case.

---

[17] The government briefly argues that cryptocurrency users do not have a reasonable expectation of privacy in their information because it is published "on a public blockchain ledger." Mem.26. But the reporting mandate does not seek the information that is published on the public ledger. It seeks the information that is not published, and which users do not share.

That is why *United States v. Gratkowski* can't help the government. *See* Mem.26. The challenger in *Gratkowski* made the ambitious argument that he could prevent the government from viewing the public ledger itself, even though anyone can view that ledger. 964 F.3d 307, 311 (5th Cir. 2020). The plaintiffs here have no objection to the government viewing the public ledger; their objection is to the government forcing them to divulge information that they do not share on the public ledger or anywhere else.

Even if cryptocurrency users did share the information revealed by §6050I with third parties, the reporting mandate would still be a Fourth Amendment search. The government cannot invoke the third-party exception unless it clears several hurdles. *Warshak*, 631 F.3d 266; *Carpenter*, 138 S. Ct. 2206. Among other requirements, the government cannot be seeking more than a "limited" view of a person's affairs. *Smith*, 442 U.S. at 742. The information must be shared "voluntarily." *Miller*, 425 U.S. at 442-43; *Smith*, 442 U.S. at 744. And the government cannot seek information from the targeted party himself, rather than the uninterested party he shared the information with. *E.g.*, *Carpenter*, 138 S. Ct. at 2212 ("MetroPCS and Sprint"); *Smith*, 442 U.S. at 744 (phone company); *Miller*, 425 U.S. 435 (bank).[18]

None of these preconditions are met here. The reporting mandate seeks to "access detailed information about a person's familial, political, professional, religious, and sexual associations," *Carpenter*, 138 S. Ct. at 2217, and to "gain the ability to peer deeply into [a person's] activities," *Warshak*, 631 F.3d at 284.; *see* Am.Compl. ¶¶106-13. Information subject to the reporting mandate is not voluntarily shared; it is—by the government's own account—shared by compulsion of tax laws. Mem.23-24. And the reporting mandate compels production by the targeted parties themselves. 26 U.S.C. §6050I(b).

Finally, even if the plaintiffs lacked a "reasonable expectation of privacy" in the information exposed by the reporting mandate, the reporting mandate still effects a search because it violates their property rights. *Florida v. Jardines*, 569 U.S. 1, 11 (2013). Traditionally, "[t]he protection of private

---

[18] The government denies that "the third-party doctrine is restricted to sharing of information that provides a limited view of a person's affairs." Mem.27 n.10. But the Sixth Circuit and Supreme Court disagree. In a case applying the doctrine, the Sixth Circuit distinguished bank records from emails because the latter are "potentially unlimited." *Warshak*, 631 F.3d 266, 288 (6th Cir. 2010). And in another case applying the doctrine, the Supreme Court distinguished a "pen register" from the "listening device employed in *Katz*" because the pen register disclosed far less information. *Smith*, 442 U.S. at 741-42. Courts continue to decide third-party-exception cases by asking, like in *Smith*, whether the information to be obtained is "limited." *E.g.*, *Gratkowski*, 964 F.3d at 312.

property extended to letters, papers, and documents." *United States v. Miller*, 982 F.3d 412, 432 (6th Cir. 2020). If someone accessed such documents without consent, they would commit "trespass to chattels." *Id.* at 433. And they would violate the Fourth Amendment. *Ex Parte Jackson*, 96 U.S. 727 (1877). Today, the forced exposure of digital "files" is therefore fairly "characterized as a 'trespass to chattels' and an illegal 'search.'" *Miller*, 982 F.3d at 433. The personal information subject to the reporting mandate includes the parties' papers and effects, so the mandate is the equivalent to a trespass to chattels and violates the Fourth Amendment.

### 2. The search is unreasonable.

All parties appear to agree that, if the reporting mandate effectuates a search, it is "unreasonable." *See* Mem.22-32 (not arguing reasonableness). That makes sense. "[R]easonableness generally requires the obtaining of a judicial warrant." *Riley*, 573 U.S. at 382. "[W]arrantless searches are per se unreasonable," absent a "specifically established and well-delineated exceptio[n]." *City of Ontario v. Quon*, 560 U.S. 746, 760 (2010) (cleaned up). The reporting mandate does not wait for warrants—it's an attempt to replace them. And no exceptions apply.

### 3. There is no barrier to a facial challenge.

The Supreme Court has long "entertained facial challenges under the Fourth Amendment to statutes authorizing warrantless searches." *Patel*, 576 U.S. at 416. It "has on numerous occasions declared statutes facially invalid under the Fourth Amendment." *Id.* at 417. Most recently, in *Patel*, the Supreme Court held that a law facially violated the Fourth Amendment where it compelled hotel managers to keep records about their customers and produce them to the police. *Id.* at 428. The law compelled them to "ma[k]e available to any officer" certain recorded "information about their guests," such as "the guest's name and address" and "the rate charged and amount collected for the room; and the method of payment." *Id.* at 412-13. The Court held that the statute authorized "searches" that

were "unreasonable." *Id.* at 419. Because the statute authorized unreasonable searches, the Court held that it was facially unconstitutional. *Id.* at 428.

The government's only argument against facial relief is that the reporting mandate has a "plainly legitimate sweep." Mem.29. Namely, the government offers three "examples of transactions" where it says the reporting mandate complies with the Fourth Amendment. Even if three were enough, the government goes 0-for-3.

First, the reporting mandate still violates the Fourth Amendment when it forces Coin Center to report anonymous donations. Mem.30-31. Whether or not "Coin Center accepts cash donations" and reports those now—the complaint does not say—is irrelevant. Mem.31. An organization is not estopped from asserting its constitutional rights against one reporting requirement because it complies with a different reporting requirement. Nor would it help the government if the statute exempted Coin Center's "receipt of donations." Mem.31. The statute does not exempt them. *See* Am.Compl. ¶¶32-33, 150-52. But even if it did, pointing to instances where a statute *does not apply* cannot defeat a facial challenge. *Patel*, 576 U.S. at 419.

Second, the reporting mandate does not comply with the Fourth Amendment when it forces Mr. Carman to report his business transactions. Mem.29-30. The government says parties to a transaction lose their "privacy interest" by sharing the information with each other, Mem.30, but the government's assumptions about what Mr. Carman shares in his business relations appear nowhere in the complaint. Mem.30. Even sharing the information would not amount to a forfeiture of the parties' reasonable expectations of privacy. *See e.g.*, *Warshak*, 631 F.3d 266. And this whole line of attack— identifying situations where a Fourth Amendment exception would apply—was rejected in *Patel*. As the Supreme Court explained, that "logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches." 576 U.S. at 418.

36

Third, the reporting mandate does not comply with the Fourth Amendment when it forces Coin Center to report its event sponsorships, even if Coin Center lists some event sponsors on its website. Mem.31-32. The government again here relies on an improper factual assertion not in the complaint, overstates the third-party exception, and tries the ploy that *Patel* rejected. 576 U.S. at 418. On top of those problems, its example relies on a false equivocation. A sponsorship page informs the public only that an event sponsor made a payment of some unknown amount on some unknown date. The reporting mandate requires information that the sponsorship page does not include—the sponsor's address, Social Security number, the nature of his payment, the form of his payment, the amount of his payment, the date of his payment, and more. None of that information is "forfeited," Mem.32, by the posting of a "logo" on a "website," Mem.31.

### C. The reporting mandate is unconstitutionally vague.

The reporting mandate is also unconstitutionally vague. A statute is void for vagueness if it does not "give people of common intelligence fair notice of what the law demands of them." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). The plaintiffs' complaint presented three concerns about the law's indeterminacy:

1. What does a "person from whom the [cryptocurrency] was received," 26 U.S.C. §6050I(b)(2), mean given that cryptocurrency users receive cryptocurrency from addresses that are controlled by software, decentralized tools that are automated processes and not persons, or large groups of people? Am.Compl. ¶¶243-47;

2. When does the "receip[t]" occur for users of cryptocurrency, 26 U.S.C. §6050I(a), given that cryptocurrency transactions often depend on multiple steps (which can last more than 15 days) by multiple people during which nobody exclusively controls the assets? Am.Compl. ¶244;

3. When does a transaction "entire[ly] … occu[r] outside the United States," 26 U.S.C. §6050I(c)(2), given that all transactions are completed through decentralized networks worldwide? Am.Compl. ¶250.

The government has no answers because "the questions have no good answers." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018). Yet the mandate attaches felony criminal penalties to those who do not answer correctly. 26 U.S.C. §7203. It is unconstitutionally vague.

The government makes three vagueness arguments. None has merit.

First, the government argues that a statute cannot be *facially* vague when the vagueness problems do not "implicate the First Amendment." Mem.35. This argument is identical to Justice Alito's in *Johnson v. United States. See* 576 U.S. 591, 636 (2015) (Alito, J., dissenting) ("'[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined' on an as-applied basis."). But the Supreme Court "flatly" rejected Justice Alito's (and the government's) position and "facial[ly] invalid[ated]" the law there, which didn't implicate the First Amendment. *Id.* The Court has since tripled down on that rejection. *Sessions*, 138 S. Ct. 1204; *Davis*, 139 S. Ct. 2319.

Second, the government argues that because there are supposedly "two examples where the statute can easily be applied" to the plaintiffs, the statute is not unconstitutionally vague. Mem.36-37. But *Johnson* and its progeny triply rejected this argument too. 576 U.S. at 602 ("[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."); *see also id.* (explaining that ban on charging "unjust and unreasonable rate" was facially vague "even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable"); *Dimaya*, 138 S. Ct. 1204; *Davis*, 139 S. Ct. 2319.[19]

Third, the government argues that the reporting mandate is not vague because it could issue a new Form 8300. Mem.36. But it hasn't. And it can't because the vagueness problems here go to the statute itself. *See* 26 U.S.C. §6050I ("person from whom the cash was received," "date … of transaction," "entire transaction occurs outside the United States").

---

[19] The government also says in a footnote that if a more challenger-friendly vagueness standard exists, it should apply only to criminal statutes *without* scienter requirements, whereas the reporting mandate is a criminal statute with a scienter requirement. Mem.36 n.15. That position can't be reconciled with *Johnson*, *Dimaya*, and *Davis*, which were about all manner of violent crimes, where scienter requirements are routine.

**D. The reporting mandate exceeds Congress's enumerated powers.**

The Sixteenth Amendment, standing on its own, does not authorize the reporting mandate. It gives Congress the power to "lay and collect taxes on incomes." U.S. Const., amend. XVI. It "authorizes the imposition of an income tax without apportionment among the states." *Broughton v. United States,* 632 F.2d 706, 707 (8th Cir. 1980). It does not grant Congress the power to impose a reporting requirement on non-taxable receipts or to freely share that information with local, state, and foreign law-enforcement officers who play no role in "collect[ing] taxes," 26 U.S.C. §6103. None of the government's cases hold otherwise.[20]

The Interstate Commerce Clause alone does not authorize the reporting mandate either. The mandate "contains no jurisdictional element" or "congressional findings regarding the effects upon interstate commerce." *United States v. Morrison*, 529 U.S. 598, 612-13 (2000); *see* Pub. L. 98–369 (1984); Pub. L. 100–690 (1988); Pub. L. 104–168 1452 (1996); Pub. L. 117-58 (2021).

While most tax-reporting requirements are justified as "necessary and proper" to the Sixteenth Amendment power to collect taxes, Art. I, §8, the reporting mandate is not. The government ignores the decisive caveat from *NFIB*: The Necessary and Proper Clause cannot authorize a "great substantive and independent power." *NFIB*, 567 U.S. at 561 (controlling op. of Roberts, C.J.). A power is great if its logic would "work a substantial expansion of federal authority." *Id.* at 560. The reporting mandate here does that because, in the name of collecting taxes, it lets the government collect reams

---

[20] *See Lonsdale v. United States*, 919 F.2d 1440, 1448 (10th Cir. 1990) (challenge to income tax itself); *Acker v. Comm'r*, 258 F.2d 568, 572 (6th Cir. 1958) (challenge to requirement regarding *taxable* income); *United States v. Kahriger*, 345 U.S. 22, 31 (1953) (challenge to requirement for those *subject to the tax itself*); *see also id.* ("Unless there are provisions, *extraneous to any tax need*, courts are without authority to limit the exercise of the taxing power." (emphasis added)); *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937) (challenge to *tax itself*); *Seven-Sky v. Holder*, 661 F.3d 1, 49 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (dissenting opinion that nonetheless distinguished the power to require reports based on "tax" obligations from the power to reach, like the reporting mandate, "underlying private behavior").

of sensitive non-tax information—including associations so private and transactions so minor that they would never fall within Congress's other enumerated powers—and then use that information for non-tax reasons, like sharing it with law enforcement. This lurking and limitless power cannot be authorized by the Necessary and Proper Clause. *NFIB*, 567 U.S. at 561; *see also Bond v. United States*, 572 U.S. 844 (2014).

**E. The reporting mandate unconstitutionally compels self-incrimination.**

Although the reporting mandate unconstitutionally compels self-incrimination, *see United States v. Hubbell*, 530 U.S. 27, 49 (2000) (Thomas, J., dissenting), this Court is bound by precedent saying it does not. The plaintiffs make this argument only to preserve it for the Supreme Court.

## CONCLUSION

The government's motion to dismiss should be denied.

Respectfully submitted,

Dated: January 17, 2023

*/s/ Cameron T. Norris*
Cameron T. Norris (pro hac vice)
Jeffrey M. Harris (pro hac vice)
Jeffrey S. Hetzel (pro hac vice)
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

Jason L. Hargadon
Hargadon Law Group LLC
111 Church Street, Suite 100
Lexington, Kentucky 40507
(Tele) (859) 971-0060
jhargadon@hargadonlawgroup.com

J. Abraham Sutherland (pro hac vice)
106 Connally Street
Black Mountain, NC 28711
Telephone: 805.689.4577

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I e-filed this response with this Court on January 17, 2023, which emailed everyone requiring notice.

*/s/ Cameron T. Norris*